UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DENIMAFIA INC.,                                    :

                 Plaintiff,          :          12 Civ. 4112 (AJP)

         -against-                       :          **OPINION & ORDER**

NEW BALANCE ATHLETIC SHOE, INC., FOOT   :
LOCKER, INC., THE SPORTS AUTHORITY, INC.
and FAMOUS HORSE, INC. d/b/a V.I.M.,     :

              Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEW BALANCE ATHLETIC SHOE, INC.,          :

           Counterclaim-Plaintiff,      :

         -against-                       :

DENIMAFIA INC.,                                    :

           Counterclaim-Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

         Denimafia brings this action against New Balance and retailers Foot Locker, Sports

Authority and Famous Horse (collectively, "New Balance") seeking damages for trademark

infringement (Count I), trademark counterfeiting (Count II) and federal unfair competition (Count

III) under the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a), as well as common law unfair

competition and misappropriation of intellectual property rights (Count IV), common law trademark

infringement (Count V) and deceptive trade practices (Count VI) under New York law.  (Dkt. No.

33: Am. Compl. ¶¶ 40-75.)  New Balance counterclaimed for cancellation of Denimafia's trademark

2

registration alleging fraud (Counterclaim I) and nonuse (Counterclaim II) under the Lanham Act, 15 U.S.C. §§ 1064, 1068, 1119.  (Dkt. No. 37: Ans. & Counterclaims ¶¶ 54-77.)[1]

The parties have cross-moved for summary judgment.  (Dkt. No. 87: New Balance Notice of Motion; Dkt. No. 91: Denimafia Notice of Motion.)  The parties have consented to my decision of this case pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 28: Consent to Magistrate Judge Jurisdiction.)  For the reasons set forth below, New Balance's motion is <u>GRANTED</u>.[2]

## FACTS

### The Parties

#### Denimafia

Denimafia is a New York-based company founded in 2001 by Christine Rucci, a thirty-year veteran of the fashion industry with an expertise in denim.  (Dkt. No. 89: Defs Rule 56.1

---

[1]    Defendants Foot Locker, The Sports Authority and Famous Horse answered without asserting counterclaims.  (<u>See</u> Dkt. No. 47: Foot Locker Ans.; Dkt. No. 49: Sports Authority Ans.; Dkt. No. 51: Famous Horse Ans.)

[2]    Denimafia's motion is limited to seeking to dismiss New Balance's second counterclaim, which asserts that Denimafia abandoned any rights in the <=> mark and seeks cancellation of Denimafia's trademark registration for nonuse pursuant to 15 U.S.C. §§ 1068, 1119. (Denimafia Notice of Motion; <u>see</u> Ans. & Counterclaims ¶¶ 68-77: Countercl. II.)  The parties' submissions also indicate that New Balance may have agreed to withdraw some or all of its counterclaims, including its fraud-based first counterclaim, in exchange for Denimafia's voluntary amendment of its trademark registration.  (Dkt. No. 89: Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶ 27; Dkt. No. 90: Edelman Aff. Ex. 23: 11/3/13 Benjamin Letter; Edelman Aff. Ex. 22: 11/6/13 Hosp Letter; Dkt. No. 109: Benjamin Aff. Ex. 48: 11/15/13 Section 7 Trademark Amendment Request; Benjamin Aff. Ex. 49: 11/15/13 Hosp & Benjamin Emails; <u>see</u> Ans. & Counterclaims ¶¶ 54-67: Countercl. I.)  Denimafia's cross-motion may be moot in light of today's decision and the parties' discussions.  New Balance is to advise the Court by March 10, 2014 whether it voluntarily withdraws its counterclaims.

Stmt. ¶¶ 1-3;[3/] Dkt. No. 106: Rucci Aff. ¶¶ 1-4.)  In 2003, Denimafia began its "5EP" denim and clothing line with the goal of reaching eleven million dollars in annual sales by 2010.  (Defs. Rule 56.1 Stmt. ¶¶ 2-3; Rucci Aff. ¶ 5.)  Rucci's February 12, 2003 applications for federal registrations for the "5EP" word mark and the "<=>" design mark were granted on June 1, 2004.  (Defs. Rule 56.1 Stmt. ¶ 4; Rucci Aff. ¶ 14; Dkt. No. 90: Edelman Aff. Ex. 7: USPTO Status Report for Reg. No. 2,849,712; Edelman Aff. Ex. 8: USPTO Status Report for Reg. No. 2,849,714.)  In 2006, along with other joint venturers, Denimafia formed 5EP Studio Inc., the entity through which Denimafia's 5EP clothing line would be sold, and Rucci transferred the 5EP and <=> marks to 5EP Studio.  (Defs. Rule 56.1 Stmt. ¶¶ 6-7; Edelman Aff. Ex. 9: 1/1/06 Letter Agmt.; Edelman Aff. Ex. 12: 10/30/06 Trademark Assignment.)

From 2004 through 2007, Rucci operated Denimafia and 5EP Studio out of her home and/or another company's office.  (Defs. Rule 56.1 Stmt. ¶¶ 5, 8; Denimafia Rule 56.1 Counter-Stmt. ¶ 8; Rucci Aff. ¶¶ 2, 36.)  In 2007, Rucci and the other 5EP Studio investors disagreed about advertising and promotional spending and Rucci's employment contract was not renewed.  (Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 9; Rucci Aff. ¶¶ 40-42.)  After 2008, neither Denimafia nor 5EP Studio manufactured any new products bearing the <=> mark.  (Defs. Rule 56.1 Stmt. ¶ 10.)[4/]  As of August 3, 2010, the remaining 5EP Studio inventory "consisted of fragmented

---

[3/]     Denimafia's Rule 56.1 Counter-Stmt. (Dkt. No. 108) only responded to the paragraphs of defendants' Rule 56.1 Stmt. that Denimafia disputed.  Unless otherwise indicated, therefore, the Court's citations to Defs. Rule 56.1 Stmt. are to those paragraphs conceded by Denimafia to be undisputed.

[4/]     Since 2008, Denimafia has offered fashion consulting services such as advising clients on the selection and use of textiles.  (Defs. Rule 56.1 Stmt. ¶ 17; Denimafia Rule 56.1 Counter-Stmt. ¶¶ 17, 28; Rucci Aff. ¶ 4.)

sizes (not enough quantity in each size), making it impossible to sell to retailers." (Denimafia Rule 56.1 Counter-Stmt. ¶ 13; Rucci Aff. ¶ 48; Dkt. No. 109: Benjamin Aff. Ex. 37: 8/3/10 Rucci Email.)

The 5EP Studio joint venture formally dissolved in December 2010. (Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 11; Rucci Aff. ¶ 49; Benjamin Aff. Ex. 36: 7/12/10 Dissolution Notice.) Under the dissolution agreement, 5EP Studio granted Denimafia a perpetual license "to manufacture, use and distribute any products in the field of high quality jeans, outerwear, knits, pants and shirts under 5EP's trademark, namely '5EP' and all its derivatives." (Edelman Aff. Ex. 10: Joint Venture Termination Agmt. § 5; see Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 15; Rucci Aff. ¶ 50.) 5EP Studio assigned the 5EP and <=> marks to Parotex, Inc., a company owned by one of the other 5EP Studio joint venturers. (Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 14; Edelman Aff. Ex. 17: 1/12/11 Assignment of Assets.)

**New Balance**

New Balance was founded in 1906 and is one of the world's largest manufacturers and distributers of athletic footwear and athletic apparel. (Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 87-88.) In 2009, New Balance began work on a performance shoe designed "to provide a closer-to-barefoot experience than that delivered by ordinary athletic shoes" and "to encourage a more natural foot position and foot-strike, while also reducing the weight of the shoe." (Defs. Rule 56.1 Stmt. ¶¶ 89-91.) In 2010, New Balance labeled the performance footwear its "Minimus" collection, named for the minimalist shoe design. (Defs. Rule 56.1 Stmt. ¶ 90.) The Minimus collection is New Balance's most technical product line. (Defs. Rule 56.1 Stmt. ¶¶ 91-92, 108; Dkt. No. 108:

5

Denimafia Rule 56.1 Counter-Stmt. ¶¶ 92, 108; Dkt. No. 109: Benjamin Aff. Ex. 3: Kligerman Dep. at 19-26.)[5/]

**The <=> Mark**

### The Trademark Registration

On January 7, 2011, the original registrations for the 5EP and <=> marks were cancelled for failure to file a statement of continuing use.[6/]   Parotex applied for new trademark registrations in February 2011, which were granted on August 30, 2011.[7/]   In May 2012, Parotex assigned the 5EP and <=> marks to Denimafia in exchange for $5,001.[8/]   Denimafia owns the current trademark registration for the <=> design mark, Registration Number 4,019,180.  (Defs. Rule 56.1 Stmt. ¶ 19; Edelman Aff. Ex. 18: USPTO Status Report for Reg. No. 4,019,180.)

The <=> mark registration describes the design as follows: "The mark consists of two horizontal parallel lines in the middle space between a right pointing arrowhead with curved sides

---

[5/]   The retailer defendants, Foot Locker, Sports Authority and Famous Horse, are sued because they sell New Balance's products.  (Defs. Rule 56.1 Stmt. ¶¶ 93-96; Denimafia Rule 56.1 Counter-Stmt. ¶¶ 93, 96.)  Denimafia did not conduct any discovery relating to the retailer defendants and produced no evidence as to the retailer defendants' liability.  (Defs. Rule 56.1 Stmt. ¶¶ 97-98.)

[6/]   Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶ 16; Dkt. No. 90: Edelman Aff. Ex. 7: USPTO Status Report for Reg. No. 2,849,712; Edelman Aff. Ex. 8: USPTO Status Report for Reg. No. 2,849,714; Edelman Aff. Ex. 13: 1/27/11 Rucci Email.

[7/]   Defs. Rule 56.1 Stmt. ¶¶ 16, 19; Dkt. No. 109: Benjamin Aff. Ex. 44: Reg. No. 4,019,180; Benjamin Aff. Ex. 45: Reg. No. 4,019,071; Edelman Aff. Ex. 18: USPTO Status Report for Reg. No. 4,019,180.

[8/]   Defs. Rule 56.1 Stmt. ¶ 18; Edelman Aff. Ex. 19: 5/21/12 Trademark Assignment; Edelman Aff. Ex. 20: 5/21/12 Trademark Assignment Execution Agmt.; Edelman Aff. Ex. 1: Rucci Dep. at 211-12.

6

and a left pointing arrow head with curved sides." (Benjamin Aff. Ex. 44: Reg. No. 4,019,180; see Defs. Rule 56.1 Stmt. ¶ 20; Edelman Aff. Ex. 18: USPTO Status Report for Reg. No. 4,019,180.)

The <=> mark was registered for: "Clothing, namely, t-shirts, jeans, jackets, sports jackets, parkas, ponchos, shirts, pants, underwear, skirts, dresses, shorts, trousers, socks, shoes, footwear, hosiery, scarves and hats." (Benjamin Aff. Ex. 44: Reg. No. 4,019,180; Edelman Aff. Ex. 18: USPTO Status Report for Reg. No. 4,019,180; Defs. Rule 56.1 Stmt. ¶ 21.)  The list of goods in the registration was based solely on the information in the first, cancelled <=> trademark registration.[9/]  The <=> mark was never used on many of the goods listed in the registration including, inter alia, socks, shoes and footwear.[10/]  On November 15, 2013, Denimafia filed a request to amend Registration Number 4,019,180 "by deleting the following: 'parkas, ponchos, underwear, shorts, socks, shoes, footwear, hosiery, scarves and hats.'"[11/]

**Strength of the <=> Mark**

Denimafia sells its clothing under the brand name 5EP, based on the phrase "'5 easy pieces,'" which represents "an underlying concept that informs the 5EP collection, namely, the idea

---

[9/]   Defs. Rule 56.1 Stmt. ¶¶ 16, 22; Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶ 24; Edelman Aff. Ex. 14: Goldman Dep. at 157-58; Edelman Aff. Ex. 18: USPTO Status Report for Reg. No. 4,019,180 at NB0163460; see Edelman Aff. Ex. 8: USPTO Status Report for Reg. No. 2,849,714.

[10/]   Defs. Rule 56.1 Stmt. ¶¶ 23-27; Denimafia Rule 56.1 Counter-Stmt. ¶¶ 24-25, 27; Edelman Aff. Ex. 1: Rucci Dep. at 164-68; Edelman Aff. Ex. 21: Denimafia Am. Resp. to 1st Reqs. for Admission Nos. 36-38, 42-47.

[11/]   Benjamin Aff. Ex. 48: 11/15/13 Section 7 Trademark Amendment Request; see Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 27; Edelman Aff. Ex. 23: 11/3/13 Benjamin Letter; Edelman Aff. Ex. 22: 11/6/13 Hosp Letter; Benjamin Aff. Ex. 49: 11/15/13 Benjamin Email.

that everyone needs 5 really good pieces in their wardrobe."[12]  Denimafia's 5EP brand uses the <=>

design, which reflects the brand's "'less is more' approach and design aesthetic."[13]

The "'less is more'" concept is used widely with consumer products and the concept

"is ubiquitous in fashion, and design more generally."[14]  Both the <=> design and the "'less is more'"

phrase also are used by third parties.[15]  The regular use of the <=> symbol without explanation as

to its meaning "suggest[s] consumers understand [its] meaning as 'less is more'; otherwise [its] use

---

[12]   Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶¶ 28-30; Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 28-30, 45; Dkt. No. 106: Rucci Aff. ¶¶ 10-12; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 39-40, 47, 66, 68-71; Edelman Aff. Ex. 2: 2005 Bus. Plan; Edelman Aff. Ex. 6: Denimafia Homepage; Edelman Aff. Ex. 24: 2008 Bus. Plan; Edelman Aff. Ex. 25: 2010 Bus. Plan; Edelman Aff. Ex. 27: 6/8/12 Denimafia Facebook Post; Edelman Aff. Ex. 32: The Denim Bible: Jeans Encyclopedia II 133 (C. Blomquist rev. ed.); Edelman Aff. Ex. 47: 5EP Label Background.

[13]   Defs. Rule 56.1 Stmt. ¶¶ 31-35; Rucci Aff. ¶¶ 8-9, 11-12; Edelman Aff. Ex. 1: Rucci Dep. at 74; Edelman Aff. Ex. 27: 6/8/12 Denimafia Facebook Post; Edelman Aff. Ex. 28: Turner Dep. at 15-16; Edelman Aff. Ex. 29: Blundell Dep. at 60-62; Edelman Aff. Ex. 30: Blomquist Dep. at 47, 63-64; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶¶ 11, 16; Edelman Aff. Ex. 32: The Denim Bible: Jeans Encyclopedia II 133.

[14]   Defs. Rule 56.1 Stmt. ¶¶ 38-39; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶¶ 36-38; Edelman Aff. Ex. 36: Harriet Walker, Less is More: Minimalism in Fashion (Merrell 2011); see Denimafia Rule 56.1 Counter-Stmt. ¶ 39.

[15]   Defs. Rule 56.1 Stmt. ¶ 37; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶¶ 36-38 & nn.9-11; Edelman Aff. Ex. 33: Third-Party Website Screen Shots; Edelman Aff. Exs. 34 & 35: Reg. Nos. 4,292,788 & 4,292,789: Less Equals More LLC Registrations for <=> Design Mark.

Denimafia asserts that it "has taken steps to stop other third party infringers, including some of those specifically cited by Defendants." (Denimafia Rule 56.1 Counter-Stmt. ¶ 37; Rucci Aff. ¶ 65.)  All of the "cease and desist letters" submitted by Denimafia post-date this lawsuit. (Dkt. No. 109: Benjamin Aff. Ex. 10: 9/9/13 Rucci Email & Letter to Redbubble, 9/5/13 Rucci Emails to Zazzle, 10/12-12/20/12 Emails & Letters between Rucci's Counsel and Counsel for Finis; see Dkt. No. 1: 5/23/12 Compl.)

would be nonsensical." (Defs. Rule 56.1 Stmt. ¶ 40; see Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶¶ 36-38; Edelman Aff. Ex. 33: Third-Party Website Screen Shots.)

### Denimafia's Use of the <=> Mark

The style of Denimafia's mark reflects the vintage themes that influenced the brand's products each season.[16]  Denimafia's design uses a bold typeface with curved arms in the greater-than and less-than symbols, giving the mark "an antique feel" that "makes the symbols appear to be a stamp." (Defs. Rule 56.1 Stmt. ¶¶ 42-43.)

On its website, promotional materials, invoices and business plans, Denimafia always uses the mark in conjunction with the Denimafia and/or 5EP brand names, which are displayed in larger font than the <=> mark.[17]  On the products themselves, however, Denimafia uses the <=> mark both alone and in conjunction with the brand names. (Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 44; Rucci Aff. ¶ 12.) On the labels sewn into the products, the <=> mark always is used in conjunction with the Denimafia and/or 5EP brand names, which are displayed in larger font than the <=> mark. (Defs. Rule 56.1 Stmt. ¶ 44; Am. Compl. Ex. 3: Denimafia Product Photos.)[18]  On hangtags pinned to the products, the mark always is used in conjunction with the 5EP

---

[16]    Dkt. No. 89: Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶¶ 41, 43; Dkt. No. 106: Rucci Aff. ¶¶ 66-67; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 77-78; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 41; Edelman Aff. Ex. 37: Fall 2007 5EP Press Release; Edelman Aff. Ex. 38: Rucci Interview; Edelman Aff. Ex. 47: 5EP Label Background.

[17]    Defs. Rule 56.1 Stmt. ¶ 44; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 42; Edelman Aff. Ex. 6: Denimafia Homepage; Dkt. No. 33: Am. Compl. Ex. 6: Denimafia Homepage, Promotional Materials & Invoices; Edelman Aff. Exs. 39-46: Denimafia Invoices; Edelman Aff. Ex. 2: 2005 Bus. Plan; Edelman Aff. Ex. 24: 2008 Bus. Plan; Edelman Aff. Ex. 25: 2010 Bus. Plan.

[18]    The mark is used alone on the secondary tags that identify the fabric and country of origin,
(continued...)

brand name, which appears on the top of the tag in a comparatively much smaller font.  (Defs. Rule

56.1 Stmt. ¶ 44; Am. Compl. Ex. 3: Denimafia Product Photos.)  The mark sometimes is used alone

on t-shirt designs, on the buttons on some pants and jackets, and in the stitching on the back pockets

of jeans.  (Rucci Aff. ¶ 12; Am. Compl. Ex. 3: Denimafia Product Photos; Am. Compl. Exs. 4 & 5:

Denimafia Product Display Photos.)  In its product displays, Denimafia uses the mark alone on its

clothing hangers and in conjunction with the brand names on its signage.  (Defs. Rule 56.1 Stmt. &

Denimafia Counter-Stmt. ¶ 44; Rucci Aff. ¶ 12; Am. Compl. Ex. 3: Denimafia Product Photos; Am.

Compl. Exs. 4 & 5: Denimafia Product Display Photos.)

### New Balance's Use of the <=> Design

In March 2010, New Balance commissioned advertising agency StrawberryFrog to

assist with the launch of the Minimus collection.  (Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶ 99.)

StrawberryFrog pitched concepts representing "'the ethos for the product'" that included a

"'Minimalist Manifesto,'" the "'Less is More'" phrase, and the <=> design.  (Defs. Rule 56.1 Stmt.

¶¶ 100-01.)  In April 2010, StrawberryFrog's counsel performed a trademark search for the <=>

design at New Balance's request.  (Defs. Rule 56.1 Stmt. ¶ 103.)  Upon discovering Denimafia's

registration, New Balance asked StrawberryFrog to stylize the <=> design to better represent New

Balance's brand and further distinguish it from Denimafia's mark.  (Defs. Rule 56.1 Stmt. ¶ 104.)[19]

---

[18]      (...continued)
          which are sewn into the inside of pant waistbands or directly below the primary label sewn
          into the inside of shirts and jackets.  (Am. Compl. Ex. 3: Denimafia Product Photos.)

[19]      StrawberryFrog produced three design options: one in a Cooper Standard font in which the
          "compressed angles of the arrows require more distance from the equal sign," and two that
          used custom ninety-degree angles for the arrows, one with sharp corners and the other with
          rounded corners.  (Dkt. No. 109: Benjamin Aff. Ex. 27: 5/6/10 Baldridge Email; Defs. Rule
          56.1 Stmt. ¶ 104.)  StrawberryFrog recommended the customized design with sharp corners
                                                                                    (continued...)

In May 2010, New Balance selected the Cooper Standard font design because it "reinforce[d] the technical, minimalist design ethos" of the Minimus collection and "the overall NB Minimus brand message 'less is more.'"[20] New Balance's final <=> design uses a "modern typeface with straight lines, solid printing, and more elongated presentation."  (Defs. Rule 56.1 Stmt. ¶ 110.) The design is "crisp and strong and highly similar in overall appearance to the NEW BALANCE and MINIMUS word marks."  (Defs. Rule 56.1 Stmt. ¶ 112.)

The <=> design is used on the tongue and sock lining of some Minimus collection footwear.  (Defs. Rule 56.1 Stmt. ¶ 109.)  New Balance usually uses the <=> design in conjunction with its "famous NEW BALANCE, NB, N, and MINIMUS trademarks."  (Defs. Rule 56.1 Stmt. ¶ 111.)

---

[19]    (...continued)
because the ninety-degree angles allowed the "pieces to come closer together and feel[] locked to each other, creating one unit," whereas the added distance between the symbols in the Cooper Standard font design created the effect of "3 separate parts instead of the illusion of one overall unit."   (Benjamin Aff. Ex. 27: 5/6/10 Baldridge Email.) StrawberryFrog felt "that using a standard font [i.e., Cooper Standard] hurts the ownability of the mark." (Benjamin Aff. Ex. 27: 5/6/10 Baldridge Email; see Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶ 105.)

[20]    Defs. Rule 56.1 Stmt. ¶¶ 105-07, 113-14; Dkt. No. 90: Edelman Aff. Ex. 85: Petrecca Aff. ¶¶ 4-6; Edelman Aff. Ex. 98: Petrecca 10/18/13 Dep. at 16; see Denimafia Rule 56.1 Counter-Stmt. ¶¶ 105, 113-14.

**The Marketplace**[21/]

**Products**

Denimafia's 5EP products have included men's t-shirts, woven shirts, jackets, chinos jeans, and casual suits, as well as women's dresses and skirts.[22/]  Denimafia's denim products originally were made from an expensive, uncommon textile known as "'selvedge' denim," although one custom order was made from a lower priced denim.[23/]  Denimafia has never sold socks, shoes or footwear of any kind.[24/]

New Balance's Minimus collection of three athletic shoe models was released into retail outlets in March 2011.  (Defs. Rule 56.1 Stmt. ¶¶ 92, 108; Edelman Aff. Ex. 83: Petrecca 10/7/13 Dep. at 68-69.)  The Minimus collection since has expanded to include "performance running apparel, sandals, socks, other outdoor products, water shoes, multisport training shoes, and

---

[21/]   Defendants submitted an expert report about the shoe and apparel industry.  (See Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶ 122.)  Denimafia did not submit any rebuttal expert report.  (See Defs. Rule 56.1 Stmt. ¶¶ 124-25.)

[22/]   Dkt. No. 89: Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶¶ 45-46, 59; Dkt. No. 106: Rucci Aff. ¶ 20; Dkt. No. 90: Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 24.

[23/]   Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶¶ 46-47; Rucci Aff. ¶¶ 21, 27; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 44; Edelman Aff. Ex. 2: 2005 Bus. Plan; Edelman Aff. Ex. 24: 2008 Bus. Plan; Edelman Aff. Ex. 25: 2010 Bus. Plan; Edelman Aff. Ex. 30: Blomquist Dep. at 60-61.

[24/]   Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶ 60; Rucci Aff. ¶ 69; Edelman Aff. Ex. 1: Rucci Dep. at 258; Edelman Aff. Ex. 21: Denimafia Am. Resp. to 1st Reqs. for Admission Nos. 36-38, 42-47, 51-53.

kids' shoes," but New Balance uses the <=> design "to a much lesser extent" on these related products.[25/]

### Marketing

Denimafia has marketed its products by maintaining an online presence, including its own website, its Facebook page and discussions on fashion-related Internet forums, by attending trade shows, and, prior to 2009, by offering its products in boutique stores and by guerilla marketing such as spray-painting sidewalks.[26/]

New Balance uses a wide range of marketing avenues, including point-of-purchase in-store materials, public relations, events, social media, and print, television and Internet advertisements.  (Defs. Rule 56.1 Stmt. ¶ 119.)  New Balance produced promotional t-shirts using the <=> design, which it distributed to retailers in connection with its sale of Minimus products; the t-shirts were never sold.  (Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶ 121.)

### Distribution

Denimafia's 5EP products have not been available for purchase through Denimafia's website since 2008.  (Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶ 53; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 256-57.)[27/]  In 2009, 5EP products were sold in one retail outlet.  (Defs. Rule 56.1

---

[25/]   Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶¶ 115-16; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 24.  New Balance has never sold denim products or jeans of any kind.  Defs. Rule 56.1 Stmt. ¶ 117; Edelman Aff. Ex. 85: Petrecca Aff. ¶ 8.

[26/]   Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 48-50; Dkt. No. 106: Rucci Aff. ¶¶ 24-26, 28-29, 31; Dkt. No. 109: Benjamin Aff. Ex. 24: 2004/2005 5EP Marketing Photos; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 122-23, 255-57; Edelman Aff. Ex. 21: Denimafia Am. Resp. to 1st Reqs. for Admission Nos. 77; Edelman Aff. Ex. 29: Blundell Dep. at 30-31; Edelman Aff. Ex. 49: Denimafia 3d Interrog. Resp. Nos. 20-21.

[27/]   There is no evidentiary support for Denimafia's statement that it intends to "revamp its
(continued...)

Stmt. ¶ 51; Edelman Aff. Ex. 1: Rucci Dep. at 131.)  Since 2009, the only way to purchase 5EP products is by contacting Rucci directly to make an inquiry.[28]

Denimafia never sold its products in any sporting goods stores and its products were never sold in any retail outlet that also sold New Balance's products.[29]  Denimafia and New Balance admittedly are not competitors.[30]

New Balance's products are sold through online and brick-and-mortar speciality athletic and footwear retailers, as well as through New Balance's own stores and website.  (Defs. Rule 56.1 Stmt. ¶ 118; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 21; Edelman Aff. Ex. 53: Meyer Aff. Ex. 1: Meyer Report ¶¶ 16, 21.)  Some New Balance products, including products from the Minimus collection, also are sold through general retail outlets.  (Denimafia Rule 56.1 Counter-Stmt. ¶ 118; Dkt. No. 109: Benjamin Aff. Exs. 14-23: Screen Shots of General Retailer Websites.)

_____

[27]     (...continued)
         website" to include an online shopping function "once this litigation is resolved."  (See Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶ 53; Dkt. No. 106: Rucci Aff. ¶ 68.)

[28]     Defs. Rule 56.1 Stmt. ¶¶ 51-52, 73-74; Denimafia Rule 56.1 Counter-Stmt. ¶ 52; Rucci Aff. ¶ 31; Edelman Aff. Ex. 1: Rucci Dep. at 256-57; Edelman Aff. Ex. 21: Denimafia Am. Resp. to 1st Reqs. for Admission Nos. 69-72; Edelman Aff. Ex. 50: 2011 Individual Purchase Emails.

[29]     Defs. Rule 56.1 Stmt. ¶¶ 55-56; Edelman Aff. Ex. 1: Rucci Dep. at 250-51; Edelman Aff. Ex. 21: Denimafia Am. Resp. to 1st Reqs. for Admission No. 74.

[30]     Defs. Rule 56.1 Stmt. ¶¶ 57-58, 137; Edelman Aff. Ex. 1: Rucci Dep. at 248-49; Edelman Aff. Ex. 29: Blundell Dep. at 65; Edelman Aff. Ex. 30: Blomquist Dep. at 110; Edelman Aff. Ex. 49: Denimafia 3d Interrog. Resp. No. 22; Edelman Aff. Ex. 53: Meyer Aff. Ex. 1: Meyer Report ¶ 21.

### Denimafia's Expansion Plans

Denimafia asserts that one of the 5EP investors "discussed a possible collaboration with Converse, the sneaker company," and that 5EP "considered producing flip flops to give away as promotional items," but there is no evidence that Denimafia ever developed any plans to design or sell shoes or athletic apparel.[31]  Denimafia asserts that 5EP "has always intended to expand into [the footwear] area," and that these plans were omitted from the potential areas of expansion identified in Denimafia's business plans because they could not "be accomplished in the immediate future."  (Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶¶ 60-61; Rucci Aff. ¶¶ 69-70; see Edelman Aff. Exs. 2, 24-25: 2005, 2008 & 2010 Bus. Plans.)  The potential areas of expansion identified in Denimafia's business plans, which included women's and children's casualwear lines, only were used with potential investors and were not disclosed to prospective customers.[32]

### Denimafia's Consumers and Sales

Denimafia's consumers are highly sophisticated, brand discerning, detail oriented, and well informed about denim products.[33]

From 2004 to 2006, Denimafia sold approximately $328,000 worth of clothing.  (Defs. Rule 56.1 Stmt. ¶ 68.)  In 2007—the last year Denimafia produced a new line—it sold approximately $170,000 worth of clothing.  (Defs. Rule 56.1 Stmt. ¶ 71.)  Thereafter, sales were

---

[31]  Dkt. No. 89: Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶ 60; Dkt. No. 106: Rucci Aff. ¶ 39; Dkt. No. 109: Benjamin Aff. Ex. 32: Guy Dep. at 79-80; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 258-59; Edelman Aff. Ex. 30: Blomquist Dep. at 110.

[32]  Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶¶ 61-62; Rucci Aff. ¶¶ 70-71; Edelman Aff. Ex. 1: Rucci Dep. at 68, 90-93, 100-02, 110-14; see Edelman Aff. Exs. 2, 24-25: 2005, 2008 & 2010 Bus. Plans.

[33]  Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 63-66; Dkt. No. 106: Rucci Aff. ¶ 72; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 251; Edelman Aff. Ex. 29: Blundell Dep. at 52-53, 56-57; Edelman Aff. Ex. 30: Blomquist Dep. at 66-67, 106-07.

limited to leftover stock and custom orders, and the annual figures declined to $35,000 in 2008, $8,500 in 2009, $1,000 in 2010, $3,800 in 2011, $340 in 2012 and $760 in 2013.  (Defs. Rule 56.1 Stmt. ¶ 71.)[34/]

Denimafia did not offer any evidence concerning the value of its brand prior to New Balance's use of the <=> design.  (Defs. Rule 56.1 Stmt. ¶¶ 78-79.)

**Actual Confusion**

**Denimafia's Evidence**

Denimafia did not conduct a survey to gauge confusion in the marketplace.  (Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶ 85; Dkt. No. 90: Edelman Aff. ¶ 14; Dkt. No. 106: Rucci Aff. ¶ 77.) Instead, Denimafia submitted anecdotal evidence from five individuals with whom Rucci had previously-established personal and professional relationships: Carole Del Signore, David Blundell, Wendy Schecter, Lisa Antonelli and Renee Barletta.[35/]

On March 22, 2012, Antonelli sent a text message to Rucci attaching a picture of an advertisement for New Balance's Minimus line from the March 22, 2012 issue of AM New York, and stating: "Christopher just pointed ad out to me!  Front cover AM newspaper."[36/]  Antonelli was not making a purchasing decision at the time she viewed the advertisement.  (Defs. Rule 56.1 Stmt.

---

[34/] Denimafia attributes the decline to a variety of outside factors, including economic downturn and disputes among investors.  (See Defs. Rule 56.1 Stmt. ¶ 77.)

[35/] Defs. Rule 56.1 Stmt. ¶¶ 80-81; Rucci Aff. ¶¶ 61-64; Edelman Aff. Ex. 1: Rucci Dep. at 213, 217, 220, 227-28, 230, 233; Edelman Aff. Ex. 5: Antonelli Dep. at 14-17, 23; Edelman Aff. Ex. 21: Denimafia Am. Resp. to 1st Reqs. for Admission Nos. 80-82; Edelman Aff. Ex. 29: Blundell Dep. at 17-20; Edelman Aff. Ex. 69: Denimafia Supp. Interrog. Resp. No. 1; Edelman Aff. Ex. 70: Barletta Dep. at 15-17; Edelman Aff. Ex. 71: Del Signore Dep. at 16-17; Edelman Aff. Ex. 72: Schecter Dep. at 19-21.

[36/] Dkt. No. 109: Benjamin Aff. Ex. 55: 3/22/12 Antonelli Text Message; see Benjamin Aff. Ex. 29: 3/22/12 New Balance AM New York Ad.; Rucci Aff. ¶ 62; Edelman Aff. Ex. 1: Rucci Dep. at 230-33; Edelman Aff. Ex. 5: Antonelli Dep. at 50.

¶ 82; Antonelli Dep. at 51.)  Antonelli was not confused by the newspaper advertisement as to the relationship between Denimafia and New Balance; she understood that they were separate companies and that New Balance was the source of the advertised sneakers.  (Antonelli Dep. at 50-51.)

On or about March 22, 2012, Schecter saw the same New Balance Minimus advertisement in the March 22, 2012 issue of AM New York.  (Edelman Aff. Ex. 72: Schecter Dep. at 30-31, 34-37; Rucci Aff. ¶ 62.)  Schecter told Rucci about the advertisement over the phone that day, and Rucci asked Schecter to document it in writing.[37]  On or about April 28, 2012, Schecter sent a text message to Rucci stating: "Been traveling like crazy sorry [I]'ve been out of touch. . . . [S]aw a w[ei]rd ad in am ny for new balance did u do a collaboration cuz it was your 5ep logo [sic]." (Benjamin Aff. Ex. 57: 4/28/12 Schecter Text Message; Schecter Dep. at 39-41.)  Schecter was not making a purchasing decision at the time she viewed the advertisement.  (Defs. Rule 56.1 Stmt. ¶ 82; Schecter Dep. at 31-32.)   The newspaper advertisement caused Schecter to believe that Denimafia and New Balance could have been working on a collaboration.  (Schecter Dep. at 31, 36-37.)

In approximately late March or early April 2012, Del Signore saw an advertisement for New Balance's Minimus line in the window of a New Balance store in Manhattan.  (Edelman Aff. Ex. 71: Del Signore Dep. at 54-56; see Benjamin Aff. Ex. 94: New Balance Fifth Ave. Window Ad.; Rucci Aff. ¶ 61.)  Del Signore told Rucci about the advertisement on April 4, 2012, and Rucci asked Del Signore to document it in writing.[38]  On April 5, 2012, Del Signore emailed Rucci: "I saw

---

[37]   Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶¶ 83-84; Rucci Aff. ¶ 64; Edelman Aff. Ex. 1: Rucci Dep. at 260-61; Schecter Dep. at 30-31, 37, 39-41.

[38]   Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶¶ 83-84; Rucci Aff. ¶ 64; Edelman Aff. (continued...)

your logo in the window of New Balance on W 20th St and 5th Ave, the corner by my office.

Congratulations – that's BIG!" (Benjamin Aff. Ex. 56: 4/5/12 Del Signore Email; see Benjamin Aff.

Ex. 94: New Balance Fifth Ave. Window Ad.)  Del Signore was not making a purchasing decision

at the time she viewed the window advertisement, and she has not purchased any Denimafia or New

Balance products since the date of the email.  (Defs. Rule 56.1 Stmt. ¶ 82; Del Signore Dep. at 65,

68.)  The window advertisement caused Del Signore to speculate that Denimafia and New Balance

could have been working on a collaboration, but she understood New Balance to be the source of

the footwear and athletic apparel she saw in the window displaying the advertisement.  (Del Signore

Dep. at 54-55, 62-66.)

On or about May 9, 2012, Blundell was shopping for New Balance running sneakers

on the New Balance website when he saw the <=> design used in connection with the Minimus line.

(Edelman Aff. Ex. 29: Blundell Dep. at 70-73.)  Blundell speculated that Denimafia and New

Balance could have been working on a collaboration.  (Blundell Dep. at 67-68, 71-73, 76-77.)  On

May 9, 2012, Blundell emailed Rucci:

> Are you doing some work with New Balance?  I know you've got fingers in
> a no. of pies at the moment[.]
>
> The reason I ask is that I[']ve just seen some NEW BALANCE trainers.  It[']s
> funny how they've come on my radar recently.  Need to get fit and thought I'd start
> running.  The only thing I could see myself running in are [N]ew Balance [or] Nike
> so had a look on line.  First thing [I] came across were NB Minimus.  They look
> great and then I notice the <=> logo on them and instantly thought . . . . . [b]et
> Christine's got another new gig.
>
> So have you branched out from Denim into a new area of expertise?  I know
> you've always had a great technical knowledge but never quite saw you doing
> footwear, you're such a Denim specialist.

---

[38]/    (...continued)
Ex. 1: Rucci Dep. at 213-14, 219-20, 260-61; Del Signore Dep. at 56.

> If you are collaborating and I'm guessing you are as it[']s your logo plastered all over the range and your motto of less equals more . . . . . can you get me a discount.  Let me know soon as I need to buy some soonish.

(Benjamin Aff. Ex. 53: 5/9/12 Blundell Email.)  New Balance's use of the <=> mark did not cause Blundell to be confused as to the source of the products, since he was looking specifically at running sneakers and he understood that Denimafia was predominantly a jeans company that did not produce footwear.  (Defs. Rule 56.1 Stmt. ¶ 82; Blundell Dep. at 72-73, 76-77.)

In approximately May 2012, Barletta was shopping for New Balance running sneakers on the New Balance website or in a New Balance store when she saw the <=> mark used in a New Balance sneaker advertisement.  (Edelman Aff. Ex. 70: Barletta Dep. at 50-51, 54-55, 63-64; Edelman Aff. Ex. 1: Rucci Dep. at 222-23.)  When Barletta asked Rucci if Denimafia and New Balance were collaborating, Rucci responded that there was no collaboration but asked Barletta to document her inquiry in writing.  (Defs. Rule 56.1 Stmt. & Denimafia Counter-Stmt. ¶¶ 83-84; Rucci Aff. ¶ 64; Edelman Aff. Ex. 1: Rucci Dep. at 222-26, 260-61; Barletta Dep. at 52-53, 62-63.)  On June 15, 2012, Barletta emailed Rucci:

> I hope you are really well.  It has been a while . . . are you doing a shoe line now?  I saw something with New Balance and got a little confused since I thought your line was only jeans.  Would love to hear all about it and what you have been up to lately.

(Benjamin Aff. Ex. 54: 6/15/12 Barletta Email.)  Barletta speculated that Denimafia and New Balance could have been working on a collaboration.  (Barletta Dep. at 52, 54.)

### New Balance's Survey Evidence

New Balance submitted Dr. Joel Steckel's expert report and survey of potential purchasers of Denimafia's goods, which he designed specifically "to determine whether there was any consumer confusion as to source, sponsorship, or affiliation between Denimafia and New

Balance."  (Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶ 127; Dkt. No. 90: Edelman Aff. Ex. 137: Steckel

Aff. Ex. 1: Steckel Expert Report ¶¶ 12, 14, 20.)

Using Denimafia's sale prices and limited channels of distribution, Dr. Steckel

determined that "the set of consumers nationwide who are the likely buyers of Denimafia's jeans"

were online shoppers who purchased denim jeans priced between $100 and $1,000 within the last

twelve months.  (Steckel Expert Report ¶¶ 15, 20-22, 33(b).)  To qualify for the survey, respondents

had to be eighteen years old or older and had to provide their gender.  (Steckel Expert Report ¶

33(b).)  Dr. Steckel replicated Denimafia's purchasing environment by conducting an Internet survey

using one image of a pair of Denimafia jeans with a hanging tag that uses the <=> design mark in

very large print displayed prominently in front of the pants.  (Defs. Rule 56.1 Stmt. ¶¶ 128-29;

Steckel Expert Report ¶¶ 29-30, 32-33 & Ex. C; Dkt. No. 88: Defs. Br. at 20 n.19.)[39]  Dr. Steckel

conducted the survey in "the commonly accepted Eveready format," which asks questions of the

following type: "'Who puts out the product shown here?'; 'Why do you say that?'; and 'What other

products does the company put out?'"  (Steckel Expert Report ¶¶ 28, 33(e)-(j); Defs. Rule 56.1 Stmt.

¶ 127.)

Dr. Steckel found zero incidents of reverse confusion and concluded that his survey

supports a finding of no likelihood of (reverse) confusion.  (Defs. Rule 56.1 Stmt. ¶¶ 130-33; Steckel

Expert Report ¶¶ 18, 41-42.)  Denimafia did not submit a rebuttal expert report.  (Defs. Rule 56.1

Stmt. ¶¶ 134-35; Edelman Aff. ¶¶ 9-10; Dkt. No. 106: Rucci Aff. ¶ 77.)[40]

---

[39]     "[T]he image in the survey was taken from the only photograph of the actual product with
         a hangtag bearing the mark shown on Denimafia's website."  (Dkt. No. 115: Defs. Reply Br.
         at 7 n.9.)

[40]     Denimafia's attacks on New Balance's expert survey are unsupported by any contrary expert
         evidence.  (See Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶¶ 126-28, 131, 133.)

**Damages**

New Balance submitted Dr. Christine Meyer's expert report, which analyzed whether Denimafia was damaged by New Balance's alleged trademark infringement.  (Dkt. No. 90: Edelman Aff. Ex. 53: Meyer Aff. Ex. 1: Meyer Expert Report; <u>see</u> Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 136-37.)  Dr. Meyer found that Denimafia suffered no lost profits and that there was no evidence of any unjust enrichment on the part of New Balance, and concluded that there was no evidence of actual harm to Denimafia.  (Defs. Rule 56.1 Stmt. ¶ 137; Edelman Aff. Ex. 53: Meyer Aff. Ex. 1: Meyer Report ¶¶ 8-9, 17, 39.)  Denimafia did not submit a rebuttal expert report.  (Defs. Rule 56.1 Stmt. ¶¶ 141-42; Edelman Aff. ¶¶ 11-12; Dkt. No. 106: Rucci Aff. ¶ 79.)

**ANALYSIS**

**I.      GOVERNING LEGAL STANDARDS**

      **A.      Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u>, <u>e.g.</u>, <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); <u>Humphreys</u> v. <u>Cablevision Sys. Corp.</u>, No. 12-4431-cv, --- F. App'x ----, 2014 WL 185010 at *1 (2d Cir. Jan. 17, 2014); <u>Connolly</u> v. <u>Calvanese</u>, 515 F. App'x 62, 62 (2d Cir. 2013); <u>Lang</u> v. <u>Ret. Living Publ'g Co.</u>, 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Adickes</u> v. <u>S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); <u>Alzawahra</u> v. <u>Albany Med. Ctr.</u>, No. 12-4517, --- F. App'x ----, 2013 WL

6284286 at *1 (2d Cir. Dec. 5, 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, No. 12-2486, --- F. App'x ----, 2013 WL 6150763 at *1 (2d Cir. Nov. 22, 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed."  Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[41/]  The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v.

---

[41/]   See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., No. 13-2921-cv, --- F. App'x ----, 2014 WL 185012 at *2 (2d Cir. Jan. 17, 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to

the issue on which summary judgment is sought, there is any evidence in the record from any source

from which a reasonable inference could be drawn in favor of the nonmoving party, summary

judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

 In considering a motion for summary judgment, the Court is not to resolve contested

issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See,

e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v.

U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).

To evaluate a fact's materiality, the substantive law determines which facts are critical and which

facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

While "disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or

unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g.,

Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

 When there are cross-motions for summary judgment:

> The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . .  Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.

Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).[42/]

---

[42/] Accord, e.g., Parent v. New York, 485 F. App'x 500, 503 (2d Cir.), cert. denied, 133 S. Ct. 652 (2012); Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011); Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010); Bronx Household of Faith v. Bd. of Educ. of N.Y., 492 F.3d 89, 96 (2d Cir. 2007); Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988); Eastman Mach. Co. v. United States, 841 F.2d 469, 473-74 (2d Cir. 1988);
        (continued...)

B.       **Applicable Trademark Law Standards**

"'A claim of trademark infringement is analyzed under a familiar two-prong test.  The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.'"  Aceto Agric. Chems. Corp. v. Bayer Aktiengesellschaft, 531 F. App'x 103, 103-04 (2d Cir. 2013); see, e.g., Louis Vuitton Malletier S.A. v. LY USA, Inc., 472 F. App'x 19, 21 (2d Cir. 2012); Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 383 (2d Cir. 2005), cert. denied, 547 U.S. 1019, 126 S. Ct. 1570 (2006).

"[T]he Lanham Act protects marks from two kinds of confusion.  It protects against direct confusion, where there is a likelihood that consumers will 'believe that the trademark owner sponsors or endorses the use of the challenged mark.'  It also protects against so-called 'reverse confusion,' where the consumer will believe 'that the junior user is the source of the senior user's goods.'"  Kelly-Brown v. Winfrey, 717 F.3d 295, 304 (2d Cir. 2013) (citation omitted).[43/]  "In reverse confusion cases, consumers may believe that the senior user is 'an unauthorized infringer, and the

---

[42/]     (...continued)
Charron v. Sallyport Global Holdings, Inc., 12 Civ. 6837, 2014 WL 464649 at *2 (S.D.N.Y. Feb. 3, 2014); BMC–The Benchmark Mgmt. Co. v. V3 231, LLC, 12 Civ. 7921, 2013 WL 5420982 at *4 (S.D.N.Y. Sept. 27, 2013); Bodur v. Palisades Collection, LLC, 829 F. Supp. 2d 246, 250-51 (S.D.N.Y. 2011) (Peck, M.J.); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F. Supp. 2d 280, 291 (S.D.N.Y. 2009); Alfano v. CIGNA Life Ins. Co., 07 Civ. 9661, 2009 WL 222351 at *13 (S.D.N.Y. Jan. 30, 2009) (Lynch, D.J.); Revlon Consumer Prods. Corp. v. Estee Lauder Cos., 00 Civ. 5960, 2003 WL 21751833 at *7 (S.D.N.Y. July 30, 2003) (Peck, M.J.).

[43/]     See, e.g., Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 490-91 (2d Cir. 1988) (holding that "reverse confusion . . . is actionable under § 43(a) of the Lanham Act"); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10 (4th ed. 2013) ("The Second Circuit has unequivocally held that reverse confusion is actionable under Lanham Act § 43(a) for infringement of unregistered marks.").

[junior user's] use of the mark may in that way injure [the senior user's] reputation and impair its good will.'" Kelly-Brown v. Winfrey, 717 F.3d at 304-05.[44/]

In determining whether there is a likelihood of confusion, courts apply the eight-factor balancing test set forth in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S. Ct. 36 (1961).[45/]

> "The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market."

Kelly-Brown v. Winfrey, 717 F.3d at 307; accord, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d at 115; Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 384.  "The application of the Polaroid test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." Kelly-Brown v. Winfrey, 717

---

[44/]    See, e.g., Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 388 n.3 ("A 'reverse confusion' situation exists where the junior user is able to amass such trademark strength in its imitative mark that the senior user's products become associated with the junior user in the minds of consumers."); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10.

[45/]    See, e.g., Kelly-Brown v. Winfrey, 717 F.3d at 307; Louis Vuitton Malletier S.A. v. LY USA, Inc., 472 F. App'x at 21; Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009); Rush Indus., Inc. v. Garnier LLC, 309 F. App'x 431, 433 (2d Cir. 2009); Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 384.

F.3d at 307 (quotations omitted).[46/]   The fact-specific nature of this inquiry does not preclude summary judgment in appropriate cases.[47/]

## II.   NEW BALANCE'S MOTION FOR SUMMARY JUDGMENT IS GRANTED AND DENIMAFIA'S MOTION IS DENIED

### A.   Strength of the Trademark

"In assessing the strength of a mark, courts focus 'on the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the marks as emanating from a particular, although possibly anonymous source.'  This inquiry encompasses two elements: (1) the degree to which the mark is inherently distinctive; and (2) the degree to which it has acquired distinctiveness in the marketplace," sometimes referred to as commercial distinctiveness or secondary meaning.  J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903883 at *15 (S.D.N.Y. May 8, 2013) (citation omitted).[48/]

---

[46/]   See, e.g., Louis Vuitton Malletier S.A. v. LY USA, Inc., 472 F. App'x at 21; Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d at 115; Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 384; Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 119 (2d Cir. 2001).

[47/]   See, e.g., Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d at 121; 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:67 ("The factual nature of the issue of likelihood of confusion does not prevent a trial court, in an appropriate case, from finding on a motion for summary judgment that [] there is no need for a trial because there is no triable issue of fact on the crucial issue of likelihood of confusion.  That is, the trial judge may find that the evidence overwhelmingly supports either a lack of likely confusion or overwhelmingly supports a finding of a likelihood of confusion." (fn. omitted)).

[48/]   See, e.g., O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 520 (S.D.N.Y. 2008) ("A mark's strength has two components: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace."); see also, e.g., Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005), cert. denied, 547 U.S. 1019, 126 S. Ct. 1570 (2006); YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x 392, 394 (2d Cir. 2003).

"Inherent distinctiveness is traditionally determined by placing a mark within one of the following categories, arranged from weakest to strongest: generic, descriptive, suggestive, or arbitrary or fanciful." O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d at 520 (fn. omitted); accord, e.g., Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 384-85. "This hierarchy is imposed because the more descriptive—rather than arbitrary—a mark is, the more likely it is that consumers will assume similar marks were chosen because they describe similar products, not because the products come from the same source." First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *7 (S.D.N.Y. July 15, 2004); see, e.g., O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d at 520 ("[C]onsumers confronted with products sold under similar descriptive marks are not likely to infer that the products are from the same source because vendors are apt to use similar terms to describe similar products.").

Generic marks, which "are those consisting of words identifying the relevant category of goods or services," have no inherent distinctiveness and are not protectable. Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 385; see, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *6. "Descriptive marks are those consisting of words identifying qualities of the product." Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 385. Descriptive marks are inherently weak, but may be strong overall "provided they have acquired secondary meaning.'" Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 385; see, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *6, *15. "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of 'imagination, thought and perception.'" Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 385 (citation omitted).[49/] Suggestive marks are inherently distinctinctive, but may be weak

---

[49/]   See, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *6 ("'A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of (continued...)

overall in the absence of acquired distinctiveness.  Star Indus., Inc. v. Bacardi & Co., 412 F.3d at

385.[50/]  Arbitrary or fanciful marks, which "are ones that do not communicate any information about

the product either directly or by suggestion," are inherently very distinctive.  Star Indus., Inc. v.

Bacardi & Co., 412 F.3d at 385; see, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *7.

        In assessing whether a mark has acquired distinctiveness in the marketplace, "a court

considers whether the primary significance of the mark to the consuming public is to 'identify the

source of the product rather than the product itself.'"  J.T. Colby & Co. v. Apple Inc., 2013 WL

1903883 at *7; see, e.g., Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d at 123.[51/]

"Factors that are relevant to a secondary meaning determination include '(1) advertising

expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of

the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of

---

[49/]     (...continued)
the goods.'").

[50/]     See also, e.g., Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 123 (2d Cir. 2001) ("Even an inherently distinctive mark can, in its commercial context, lack strength as a mark."); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *15 ("Even if the plaintiffs' mark were classified as suggestive, the lack of evidence of secondary meaning would still indicate that plaintiffs' mark is relatively weak."); Sunenblick v. Harrell, 895 F. Supp. 616, 626 (S.D.N.Y. 1995) ("[T]he classification of a mark as suggestive is not necessarily dispositive on the issue of its strength, which must finally be determined in reference to its commercial context.  Put another way, a mark may be conceptually strong and yet commercially weak if the mark lacks the requisite 'origin-indicating' quality in the eyes of consumers." (citation omitted)), aff'd, 101 F.3d 684 (2d Cir.), cert. denied, 519 U.S. 964, 117 S. Ct. 386 (1996).

[51/]     See also, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 572-73 (2d Cir. 1993) ("In evaluating a mark's strength, a court is permitted to consider the mark's secondary meaning, that is, the extent to which the public has come to identify the mark with a particular product."); O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d at 520 ("Acquired distinctiveness is a measure of 'the extent to which the public has come to identify the mark with a particular product.'"); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 488 (S.D.N.Y. 2004) ("Distinctiveness in the marketplace turns on the recognition of the plaintiffs' mark in the relevant marketplace.").

the mark's use.'" <u>J.T. Colby & Co.</u> v. <u>Apple Inc.</u>, 2013 WL 1903883 at *7; <u>see</u>, <u>e.g.</u>, <u>Medici Classics Prods., LLC</u> v. <u>Medici Grp., LLC</u>, 683 F. Supp. 2d 304, 310 (S.D.N.Y. 2010); <u>First Nat'l Bank of Omaha, Inc.</u> v. <u>Mastercard Int'l Inc.</u>, 2004 WL 1575396 at *8.

    **1.**    **<u>Denimafia's Mark is Weak</u>**

Assuming <u>arguendo</u> that Denimafia's <=> mark should be classified as suggestive, and thus considered inherently distinctive,[52] Denimafia fails to present sufficient evidence of secondary meaning from which a reasonable juror could conclude that the <=> mark is strong.

Denimafia admits that it "has never had the funds for traditional advertising such as television commercials and print advertising in magazines and newspapers," and merely offers evidence of its use of free advertising, including that it "spray painted the 5EP LOGO on the pavement of hundreds of street corners in New York City." (Dkt. No. 106: Rucci Aff. ¶¶ 24-25; Denimafia Opp. Br. at 7; <u>see</u> page 12 above.)  Advertising of this nature does not support a finding of acquired distinctiveness in the marketplace.  <u>See</u>, <u>e.g.</u>, <u>Nora Beverages, Inc.</u> v. <u>Perrier Grp. of Am., Inc.</u>, 269 F.3d 114, 123 (2d Cir. 2001) ("In light of [plaintiff's] . . . small advertising budget

---

[52]    Denimafia's mark is not entitled to a presumption of distinctiveness on the basis that it is a registered trademark.  (<u>See</u> Dkt. No. 103: Denimafia Opp. Br. at 5-6.)  The presumption of distinctiveness extends only to the goods listed in the registration, and Denimafia amended its registration to exclude shoes, the principal product on which New Balance uses the <=> design.  (<u>See</u> page 6 above.)  Accordingly, Denimafia's registration does not, in itself, give rise to a presumption that the mark is always distinctive for all uses.  <u>See</u>, <u>e.g.</u>, <u>Savin Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d 439, 457 (2d Cir. 2004) ("[A]n incontestible registered trademark enjoys a conclusive presumption of distinctiveness.  Yet even if a mark is registered and, thus, afforded the utmost degree of protection, the presumption of an exclusive right to use the mark extends only so far as the goods or services noted in the registration certificate." (citations omitted)), <u>cert. denied</u>, 546 U.S. 822, 126 S. Ct. 116 (2005); <u>Paco Sport, Ltd.</u> v. <u>Paco Rabanne Parfums</u>, 86 F. Supp. 2d 305, 312 (S.D.N.Y.) (Counterclaim-plaintiff's "only registration of the mark . . . is for use on fragrances and various cosmetics products.  This registration, therefore, cannot create the presumption that the trademark . . . is distinctive when used on clothing." (record citation omitted)), <u>aff'd</u>, No. 00-7344, 234 F.3d 1262 (table), 2000 WL 1721126 (2d Cir. Nov. 16, 2000).

relative to market competitors at the relevant time, we agree with the district court that [plaintiff] possessed a weak mark."); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 489 (S.D.N.Y. 2004) ("Plaintiffs have set up a website to promote their works, but, again, plaintiffs fail to show the expense associated with that promotional vehicle.  There can be little doubt, however, with gross sales of $15,000 over a 5-year period, that plaintiffs' advertising budget is relatively small." (citation omitted)); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *8 (S.D.N.Y. July 15, 2004).

Isolated incidents of Denimafia's unsolicited media coverage in several industry-specific publications (Rucci Aff. ¶¶ 32-33) likewise are insufficient to show secondary meaning. See, e.g., Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d at 490 ("Plaintiffs have also been unable to assert that the length of use of their mark and the unsolicited media coverage surrounding [their mark] have generated a secondary meaning.  The five-year use of the mark alone is not probative of [the mark's] secondary meaning, nor are the dozen or so unsolicited articles that praise" plaintiffs' product.); Sunenblick v. Harrell, 895 F. Supp. 616, 627 (S.D.N.Y. 1995) ("Although his products have been played on some radio stations, and have received favorable reviews in certain publications, defendants correctly point out that releases under [plaintiff's] label have been few and far between, thereby leading the court to question whether such exposure as the [plaintiff's] label has received could generate any strength in the mark."), aff'd, 101 F.3d 684 (2d Cir.), cert. denied, 519 U.S. 964, 117 S. Ct. 386 (1996).

Additionally, Denimafia's relatively unsuccessful sales figures (see pages 14-15 above) do not support a finding of acquired distinctiveness.  See, e.g., YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x 392, 394 (2d Cir. 2003); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d at 123 ("In light of [plaintiff's] . . . low level of commercial success . . . , we

agree with the district court that [plaintiff] possessed a weak mark."); W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993) (Plaintiff "has had only very modest sales since it entered the business in 1982 and suffered from a severe drop in sales due to supplier problems in 1985-1986.  This evidence indicates a low national recognition of [plaintiff's] product."); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d at 489 ("[G]rossing $15,000 over five years and the sale of 1,310 CDs does not amount to 'success' within the confines of the secondary meaning test.").

Denimafia's failure to submit consumer studies also weighs against a finding of secondary meaning.  See, e.g., Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d at 489 ("Plaintiffs have not put forth any consumer studies to demonstrate that [their mark] is linked to [plaintiffs] in the minds of consumers."); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 2004 WL 1575396 at *8; Sunenblick v. Harrell, 895 F. Supp. at 627.

Finally, the breadth of evidence rebutting Denimafia's assertions of exclusivity (see page 7 above), and the absence of any evidence suggesting the third-party uses are linked to Denimafia's mark such that they could support a plagiarism assertion, weigh against a finding of acquired distinctiveness in the marketplace.  See, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d at 573 ("[E]xtensive third party use of the words sport and stick 'weighs against a finding that [plaintiff's] trade name is strong.'"); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d at 489 ("Both plaintiffs and defendants have put forth ample documentation of the use of the term [in their mark] to describe different types of music appearing on the Internet.  However, there is no link between these uses and plaintiffs' mark." (record citations omitted)); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 2004 WL 1575396 at *8.

Accordingly, even assuming arguendo that Denimafia's mark is suggestive, the evidence is insufficient to establish a sufficient level of distinctiveness in the marketplace from which a reasonable juror could conclude that Denimafia's mark is strong. See, e.g., Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 310 (S.D.N.Y. 2010) ("Plaintiff's mark . . . is suggestive . . . . The Second Circuit explicitly rejected the argument that a suggestive mark is 'strong without evidence of secondary meaning' . . . . There is no evidence in the record that plaintiff's mark has acquired distinctiveness, and accordingly the Court concludes that the mark is weak."); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 2004 WL 1575396 at *8 ("Though suggestive, there is no evidence that [the mark] has yet acquired any significant level of distinctiveness in the consumer marketplace or that it is likely to become associated in consumers' minds with a particular [product] source."); Sunenblick v. Harrell, 895 F. Supp. at 627 (plaintiff's suggestive mark "is a very weak one").[53/]

### 2.    The Weakness of the Mark Weighs Against Denimafia

In some cases, where a plaintiff alleges reverse confusion, "it is appropriate to consider the strength of the junior user's mark, because the essence of such a claim is that the junior user overpowers the senior user's mark." Gameologist Grp., LLC v. Scientific Games Int'l, Inc., 838 F. Supp. 2d 141, 160 n.8 (S.D.N.Y. 2011), aff'd, 508 F. App'x 31 (2d Cir. 2013).[54/]  Here, there is

---

[53/]    See also, e.g., SLY Magazine, LLC v. Weider Publ'ns L.L.C., 529 F. Supp. 2d 425, 438 (S.D.N.Y. 2007) ("[W]hile plaintiff's mark is arbitrary because of its inherent distinctiveness, the lack of evidence that there is widespread commercial recognition of the plaintiff's mark demonstrates that the [plaintiff's] mark is a weak mark."), aff'd, 346 F. App'x 721 (2d Cir. 2009).

[54/]    See, e.g., J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903813 at *15 (S.D.N.Y. May 8, 2013); THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 185 & n.101 (S.D.N.Y. 2011) (collecting cases); Birmingham v. Mizuno USA, Inc., No. 09-CV-0566, 2011 WL 1299356 at *17 n.20 (N.D.N.Y. Mar. 31, 2011); Strange Music, Inc. v. Strange Music, Inc.,
(continued...)

no evidence that New Balance's <=> mark is conceptually or inherently stronger than Denimafia's mark.  (See pages 9-10 above.)[55/]

Moreover, while in some circumstances the commercial weakness of a mark will weigh in favor of a reverse confusion finding,[56/] that is not the case where, as here, there is no evidence of any negative correlation between New Balance's use of the <=> design and Denimafia's lack of success. (Dkt. No. 90: Edelman Aff. Ex. 53: Meyer Aff. Ex. 1: Meyer Report ¶ 22; see pages 11, 14-15 above.)  See, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *16 ("The plaintiffs' sales plummeted in 2006, four years before [defendant] announced the [similar] mark in 2010. . . .  As a result, there is no evidence that the commercial weakness of plaintiffs' mark has been influenced by the defendant's use of the mark . . . .  Moreover, commercial weakness is in some ways a doubleedged sword.  On the one hand, a commercially weak mark is more vulnerable to reverse confusion.  On the other hand, part of what entitles a mark to protection is its ability to serve as an indicator of origin.  Accordingly, to the extent a senior user has invested so little in its mark that it has failed to create an association in the minds of consumers between the mark and a source, there is correspondingly less reason to protect the mark.  After all, '[t]he chief danger inherent in

---

[54/]   (...continued)
326 F. Supp. 2d 481, 488 (S.D.N.Y. 2004) ("In a reverse confusion case the court should look to the strength of the junior user's mark 'because the doctrine of reverse confusion properly should focus, not on the senior user's mark, but that of the intervening junior user.'"); Sunenblick v. Harrell, 895 F. Supp. 616, 628 (S.D.N.Y. 1995), aff'd, 101 F.3d 684 (2d Cir.), cert. denied, 519 U.S. 964, 117 S. Ct. 386 (1996); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10 (4th ed. 2013) ("[T]he court should evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark.").

[55/]   See also, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *16 ("The defendant's . . . mark has no more conceptual or inherent strength than the plaintiffs' . . . mark.").

[56/]   See, e.g., THOIP v. Walt Disney Co., 788 F. Supp. 2d at 186; O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 521 (S.D.N.Y. 2008).

recognizing reverse confusion claims is that innovative junior users, who have invested heavily in promoting a particular mark, will suddenly find their use of the mark blocked by plaintiffs who have not invested in, or promoted, their own marks.'").[57/]

Accordingly, the weakness of Denimafia's mark does not make consumer confusion more likely.  This factor weighs in New Balance's favor.[58/]

### B.   Similarity of the Marks

"'In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'"  <u>Star Indus., Inc.</u> v. <u>Bacardi & Co.</u>, 412 F.3d 373, 386 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1019, 126 S. Ct. 1570 (2006).[59/]  The mere fact that two marks are "highly similar" will not weigh in favor of a likelihood of confusion where "they are presented

---

[57/]   <u>Cf.</u>, <u>e.g.</u>, <u>SLY Magazine, LLC</u> v. <u>Weider Publ'ns L.L.C.</u>, 529 F. Supp. 2d 425, 438 (S.D.N.Y. 2007) ("[T]he essence of plaintiff's reverse confusion claim is that the junior user . . . overpowers the senior user's mark. Were I to consider the strength of defendants' (the junior users') mark, as courts sometimes do when reverse confusion is alleged, this factor would still weigh in defendants' favor."), <u>aff'd</u>, 346 F. App'x 721 (2d Cir. 2009).

[58/]   Even if the Court were to weigh the weakness of the mark in Denimafia's favor, in view of the findings on the remaining factors, that would not change the overall outcome. <u>See</u>, <u>e.g.</u>, <u>Gameologist Grp., LLC</u> v. <u>Scientific Games Int'l, Inc.</u>, 838 F. Supp. 2d at 160 n.8 ("The parties agree that the defendants' mark is a strong one. Thus, if it were necessary to evaluate the strength of the junior user's mark in this case, the first factor in the <u>Polaroid</u> analysis would weigh in the plaintiff's favor. However, that would not change the Court's ultimate conclusion on likelihood of consumer confusion after balancing all of the <u>Polaroid</u> factors."); <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d at 526.

[59/]   <u>See</u>, <u>e.g.</u>, <u>Savin Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d 439, 458 (2d Cir. 2004) ("'[T]he setting in which a designation is used affects its appearance and colors the impression conveyed by it.'"), <u>cert. denied</u>, 546 U.S. 822, 126 S. Ct. 116 (2005); <u>W.W.W. Pharm. Co.</u> v. <u>Gillette Co.</u>, 984 F.2d 567, 573 (2d Cir. 1993) ("Under this prong of the inquiry, we consider whether the similarity of the marks is likely to provoke confusion among potential customers. We must therefore look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember." (citation omitted)); <u>J.T. Colby & Co.</u> v. <u>Apple Inc.</u>, 11 Civ. 4060, 2013 WL 1903883 at *16 (S.D.N.Y. May 8, 2013).

in different ways." <u>YouGottaEat, Inc.</u> v. <u>Checkers Drive-In Rests., Inc.</u>, 81 F. App'x 392, 394 (2d Cir. 2003).<u>60/</u>

It is undisputed that both marks use an equal symbol flanked by less-than and greater-than symbols.  (<u>See</u> pages 8-10 above.)  New Balance, however, argues that any similarity between the marks is unlikely to cause confusion because both New Balance and Denimafia use the symbols in conjunction with their respective house marks.  (Dkt. No. 88: Defs. Br. at 14-15; Dkt. No. 115: Defs. Reply Br. at 3.)  The Court agrees.<u>61/</u>

Denimafia usually uses the <=> mark in conjunction with its "5EP" and "Denimafia" brand house marks, and New Balance always uses the <=> mark in conjunction with its "New Balance," "NB," "N" and "MINIMUS" brand house marks (<u>see</u> pages 8-10 above), which makes confusion unlikely.  <u>See</u>, <u>e.g.</u>, <u>Lapine</u> v. <u>Seinfeld</u>, 375 F. App'x 81, 84 (2d Cir. 2010) ("[D]efendants' use of the famous [brand] name reduces any likelihood of confusion regarding the marks."); <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d at 522 ("The Second Circuit has 'repeatedly

---

<u>60/</u>    <u>See</u>, <u>e.g.</u>, <u>Savin Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d at 458 ("[E]ven close similarity between two marks is not dispositive of the issue of likelihood of confusion.  Rather, the crux of the issue is whether the similarity is likely to cause confusion among numerous customers who are ordinarily prudent.  Thus, an inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves." (citations & quotations omitted)); <u>J.T. Colby & Co.</u> v. <u>Apple Inc.</u>, 2013 WL 1903883 at *16 ("The fact that the marks use the same word is not dispositive if the differences in the ways the marks are presented in the marketplace make confusion less likely."); <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d 500, 521 (S.D.N.Y. 2008) ("Although a side-by-side comparison of the two marks is 'a useful heuristic means of investigating similarities and differences,' it is error to overemphasize this approach.  Rather, a court must analyze how the marks are viewed in the context of the marketplace, maintaining focus on the ultimate issue of the likelihood of consumer confusion." (citation omitted)).

<u>61/</u>    New Balance also argues that the marks are dissimilar because New Balance's mark "uses straight lines, solid printing, and a more elongated representation," whereas Denimafia's mark uses "distinct printing that makes the symbols appear to be a stamp" and is further distinguishable by "the curves of the arms in the greater and less than symbols."  (Defs. Br. at 13; Defs. Reply Br. at 3; <u>see</u> pages 8-10 above.)  The Court does not agree.

found that the presence of a distinct brand name . . . weigh[s] against a finding of confusing similarity.'").[62]

Denimafia does not dispute that the <=> mark is used by both parties in conjunction with their respective house marks, but instead argues that "under a reverse confusion theory, the Second Circuit has found that the use of a house mark together with the confusingly similar mark could 'simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark.'" (Dkt. No. 103: Denimafia Opp. Br. at 9.)  In some circumstances the use of house brand marks may exacerbate reverse confusion,[63] but that is not a blanket rule for all cases of reverse confusion.[64]  Rather, the use of brand house marks is considered in the context of the specific facts to evaluate the marks' similarity, which is one factor among the

_____

[62]    Accord, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d at 573 ("[W]hen a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened."); Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 968-69 (2d Cir. 1981); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *9 (S.D.N.Y. July 15, 2004) ("The prominent use of a brand name alongside a trademark can serve to dispell confusion as to the source of a product."); see also cases cited at pages 36-37 & n.65 below.

[63]    See, e.g., THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 186 & n.108 (S.D.N.Y. 2011); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10 (4th ed. 2013)  ("Some decisions have held that the junior user's use of a house mark along with the mark in issue, could aggravate, not lessen, the likelihood of reverse confusion.  The junior user's use of a well-known national house mark along with the smaller senior user's mark could strengthen a viewer's link of the mark with the senior user." (fn. omitted)).

[64]    See, e.g., Kate Spade LLC v. Saturdays Surf LLC, 950 F. Supp. 2d 639, 645 (S.D.N.Y. 2013) ("Saturdays Surf NYC argues, however, that the Kate Spade name's fame will actually lead consumers to believe that Saturdays Surf NYC has been licensed by Kate Spade to use its mark or that Saturdays Surf NYC is an infringer.  This is consistent with Saturdays Surf NYC's argument that this is a 'reverse confusion' case.  However, the problem with this argument is that the Kate Spade name is very much entrenched in the fashion marketplace as associated with women's apparel and goods, not men's.  It is unlikely that consumers would believe Kate Spade Saturday, which bears the mark of a fashion house famous for women's products, would license to or collaborate with a men's clothing company." (citation omitted)); see also cases cited at pages 36-37 & n.65 below.

"'totality of factors'" and "contextual clues" relevant to determining whether the marks' overall impression will cause confusion about the products' sources. Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 386; J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *16.

Here, both Denimafia and New Balance present the <=> symbol in ways that communicate brand messages, as opposed to source indicators, i.e., their brand house marks usually appear larger and more prominently than the <=> mark, and often with other brand message information such as product imagery and phraseology. (See Defs. Br. at 14; Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 113-14; see also pages 8-10 above.)  See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 106-07, 116 (2d Cir. 2009) (marks are "minimally similar" where defendant's products are presented "in packaging that displays the [defendant's brand] name in no subtle manner" and are often "accompanied by [defendant's brand's] domain name . . . and other products"); YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x at 394-95 ("Although [plaintiff's] mark and the Slogan are highly similar, they are presented in different ways.  The Slogan is used in conjunction with the brand name [of defendant's companies], and with their corresponding logo design (checkered tablecloth).  [Plaintiff's] mark is presented with the logo of a man wearing a sandwich-board placard.  Although in some circumstances graphic differences are irrelevant, in this case [plaintiff] operates a website, which necessarily relies on its visual displays.  Thus, because the visual differences between [plaintiff's] and Checkers' marks are significant, this factor is neutral." (citation omitted)); Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 386 (Defendant's "label displays the Bacardi 'O' design alone against a clear background, whereas [plaintiff's] label displays the Star 'O' alongside a number of other elements and against a white background.  Furthermore, each label prominently displays the brand logo . . . . In light of these differences, it cannot be said

that the similarity factor clearly favors [plaintiff], and the district court's finding that it favored [defendant] was not clear error.").[65/]

       Accordingly, because both parties used the <=> mark in combination with their brand names, the similarity of the marks factor weighs in New Balance's favor.

---

[65/]   See also, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d at 573 ("Although the marks are composed of the same words and sound the same when uttered, several factors distinguish them. First, [plaintiff's] mark appears as one word and is the only identifier of the product. On [defendant's] product, however, the words 'sport' and 'stick' are preceded in larger letters by the well-known brand name 'Right Guard.' Actors on [defendant's] television commercials also say the words 'Right Guard' before 'sport stick.' . . . The words 'sport' and 'stick' are about one-third the size of the Right Guard logo and the same size as the word 'deodorant' or 'deodorant anti-perspirant.' The district court found that the diminutive size of the words 'sport' and 'stick' was true for most of [defendant's] advertising. In addition, [defendant's] 'sport' and 'stick' are separated by a running figure. The dissimilar modes of presentation make confusion less likely. The products themselves are used for different purposes, lessening the chance that consumers will believe [plaintiff's] product originated with" defendant.); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 581-82 (2d Cir. 1991); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *17 ("The context in which the two marks appear is also quite different. Plaintiffs' mark appears on both their physical books and ebooks. In many, if not all cases, the plaintiffs' mark is in close proximity to contextual information indicating that it is associated with a publisher. . . . The Apple iBooks mark, on the other hand, appears in an Apple-branded environment—either preinstalled on Apple devices or on the Apple online App Store."); O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d at 521-22 ("[I]t is undisputed that the [defendant's] mark consistently appeared in immediate conjunction with the familiar American Express 'blue box' logo. . . . Given that the well known American Express brand name and logo was consistently presented alongside the . . . mark . . . , the marks cannot be deemed confusingly similar."); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 2004 WL 1575396 at *9 ("These brands and logos are the predominant marks on both [products] and . . . are the most likely to be recognized as the source of the [product] at issue. . . . It is far less likely that the . . . [subject] marks will be viewed by consumers as designating the source—rather than the nature—of the . . . product. In the totality of circumstances in which consumers are presented with the . . . marks, there is an insufficient basis to find that their similarity is likely to cause confusion as to the source of the [product] on which they appear."); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) (Defendants' "mark is almost always accompanied by the bat and snake logo. This logo, as it appears on defendants' CDs, in most instances, dwarfs the 'strange music' moniker that appears beneath it. . . . The marks do not create the same overall impression and their appearance in the marketplace is unlikely to confuse consumers." (citation omitted)).

C.      **Competitive Proximity**

"'This factor focuses on whether the two products compete with each other.'" <u>Savin</u> <u>Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d 439, 458 (2d Cir. 2004), <u>cert. denied</u>, 546 U.S. 822, 126 S. Ct. 116 (2005).[66/] "In assessing this factor, 'the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal.'" <u>Savin Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d at 458.[67/] "'When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded product comes from the same source.'" <u>YouGottaEat, Inc.</u> v. <u>Checkers Drive-In Rests., Inc.</u>, 81 F. App'x 392, 395 (2d Cir. 2003).[68/]

First, New Balance and Denimafia do not compete for the same consumers. (Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 57-58; <u>see</u> pages 11-14 above.) They appeal to different audiences in different sectors of the market: New Balance's Minimus line appeals to an athletic audience in the

---

[66/]   <u>See</u>, <u>e.g.</u>, <u>Cartier, Inc.</u> v. <u>Sardell Jewelry, Inc.</u>, 294 F. App'x 615, 619 (2d Cir. 2008); <u>J.T. Colby & Co.</u> v. <u>Apple Inc.</u>, 11 Civ. 4060, 2013 WL 1903883 at *17 (S.D.N.Y. May 8, 2013); <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d 500, 522 (S.D.N.Y. 2008); <u>First Nat'l Bank of Omaha, Inc.</u> v. <u>Mastercard Int'l Inc.</u>, 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *9 (S.D.N.Y. July 15, 2004).

[67/]   <u>See</u>, <u>e.g.</u>, <u>J.T. Colby & Co.</u> v. <u>Apple Inc.</u>, 2013 WL 1903883 at *17; <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d at 522.

[68/]   <u>See also</u>, <u>e.g.</u>, <u>Savin Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d at 458 ("'To the extent goods . . . serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.'"); <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d at 522 ("The Second Circuit has explained that 'ordinarily, little confusion will result when the junior use [of a similar mark] is in an area of commerce that is outside the senior owner's area.'"); <u>First Nat'l Bank of Omaha, Inc.</u> v. <u>Mastercard Int'l Inc.</u>, 2004 WL 1575396 at *9 ("'[T]he closer the secondary user's [services] are to those the consumer has seen under the prior user's brand, the more likely that the consumer will mistakenly assume a common source.'"); 4 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 23:10 (4th ed. 2013) ("Reverse confusion will not be likely if the goods or services of the parties are not competitive, the respective markets are separated and the advertising of the parties is directed at different types of purchasers.").

market for running shoes and fitness apparel, while Denimafia's denim products appeal to an urban, fashion-aware audience in the market for denim streetwear.[69]  The record is replete with evidence establishing that Denimafia and New Balance are not competitors.[70]

Second, the products are sold through different channels.  (See pages 12-13 above.) Since 2009, the only way to purchase Denimafia products is by contacting Rucci directly and making an inquiry.  (See page 13 above.)  Products from New Balance's Minimus line, which launched in 2011, may be purchased in New Balance stores, on New Balance's website, and through brick-and-mortar and online footwear and apparel retailers.  (See page 13 above.)  The absence of overlapping channels of distribution supports a finding that the parties' products are not competitively proximate and, therefore, consumer confusion is unlikely.  See, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *17-18 ("Although the products of the parties each relate to books, they are not proximate in the marketplace. . . . [T]he parties' products are sold through different channels.  The plaintiffs' products are sold in brick-and-mortar stores and on third-party websites like Amazon.com and BarnesandNoble.com.  The plaintiffs' products are not available for sale through the defendant's website, iTunes Store or iBookstore.  The defendant's e-reader software, on the other hand, is not available in brick-and-mortar stores or through third-party websites.

---

[69]    See pages 11-14 above; see also, e.g., Dkt. No. 90: Edelman Aff. Ex. 29: Blundell Dep. at 56-57 (specialty denim products appeal to "a particular type of consumer" who "wants to be different," "understand[s] where the denim comes from," "understand[s] the stitching, the detailing," and can identify a "brand of jeans . . . just from the stitching on the back pocket and the way the pocket was shaped"); Edelman Aff. Ex. 30: Blomquist Dep. at 67 (specialty denim appealed to "very fashion conscious, young, trend -- trend setters").

[70]    See page 13 above; see also, e.g., Defs. Rule 56.1 Stmt. ¶¶ 57-58; Edelman Aff. Ex. 1: Rucci Dep. at 249 ("Q.  Okay, but you were not [a] competitor of New Balance, correct?  A.  No."); Edelman Aff. Ex. 29: Blundell Dep. at 65 ("Q.  Would you consider New Balance to be a competitor of 5EP?  A.  No."); Edelman Aff. Ex. 30: Blomquist Dep. at 110 ("Q.  Would you consider New Balance to be a competitor of 5EP?  A.  No.").

Instead, the iBooks software is only available to consumers as pre-installed software on Apple devices or as a download from Apple's online App store.").[71]

In opposition, Denimafia argues that there are issues of fact regarding proximity because: (1) "The goods are sold in similar retail outlets – NB is not limited to athletic/technical sports apparel"; (2) "Denimafia and New Balance have attended the same trade shows"; and (3) "Denimafia and New Balance appeal to a similar target audience, especially given New Balance's increased expansion into a lifestyle brand."  (Dkt. No. 103: Denimafia Opp. Br. at 10-11.)

Denimafia's claim that the relevant products "are sold in similar retail outlets" is unsupported by the record and flatly contradicted since Denimafia concedes that its products have not been available in stores since 2009 while New Balance's Minimus line was launched in 2011. (See pages 11-13 above; see also Edelman Aff. Ex. 1: Rucci Dep. at 251: "Q.  To your knowledge, do you know that New Balance and 5EP jeans have ever been sold in the same stores at the same time?  A.  No.")  Moreover, it would be immaterial if the products were "sold in similar retail outlets" or that the parties "have attended the same trade shows," since even products that are sold in different areas of the same retail outlets are not considered proximate where, as here, they serve different purposes and are not in competition.  See, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 573-74 (2d Cir. 1993) ("These products do not compete nor serve the same purpose, although they may both be generally defined as personal care products.  The two products do share some of the same channels of trade but this factor alone does not make them proximate.  [S]ince

----

[71]  See also, e.g., Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) ("Plaintiffs' CDs, unlike defendants' CDs, do not appear to be sold in traditional music store or outlets.  Nor are they sold through Amazon.com or other on-line stores.  [Plaintiff's owner] testified that his CDs are sold 'primarily' through his performances and website.  Based upon these facts, there is little doubt that consumers would be confused by the proximity of the parties' products because the parties' recording[s] are sold through different channels of distribution." (citations omitted)).

modern marketing methods tend to unify widely different types of products in the same retail outlets or distribution networks, . . . this factor is not of overriding importance. These products are not displayed in the same areas of food or drug stores, the lip balm being sold generally at the check out stand and the deodorant/anti-perspirant in a section devoted to such products. This factor, then, is of little help to [plaintiff's] argument that there is a likelihood of confusion." (citation & quotations omitted)).[72/]

      Denimafia's remaining arguments—that "NB is not limited to athletic/technical sports apparel" and "Denimafia and New Balance appeal to a similar target audience"—essentially claim that the parties are competitively proximate because their products fall under the same broad category of goods, i.e., apparel. (See Denimafia Opp. Br. at 10-11.) Although both parties' products relate to apparel generally, they are not proximate in the marketplace. Denimafia is a fashion-forward company known for its denim pants, which since 2009 are purchasable only by making a direct inquiry to Rucci. (See pages 13-14 above.) New Balance is an athletic footwear company that uses the mark most often in connection with its technical running products, sold primarily at athletic and footwear stores (including New Balance's stores and website). Put simply, a consumer in the market for running shoes or athletic apparel would not purchase Denimafia's products in lieu

---

[72/]    See also, e.g., Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 967 (2d Cir. 1981) ("With regard to the structure of the market, both products are eventually sold to consumers in retail stores. However, since 'modern marketing methods tend to unify widely different types of products in the same retail outlets or distribution networks,' this factor is not of overriding importance. Within retail food stores, the record shows that the products are shelved in different sections whenever space permits . . . ." (citation omitted)); Sunenblick v. Harrell, 895 F. Supp. 616, 629 (S.D.N.Y. 1995) ("Although the products are sold in the same channels of trade, they are not sold side-by-side; rather, they are featured in different sections of the stores in which they are sold, according to genre and not by label name. Hence, absent any evidence that consumers of one will be potential consumers of the other, it is most likely that the consumer entering a record store with the intention of purchasing one of [plaintiff's] products would not even see defendants' products, much less the trademarks appearing thereon." (citation omitted)), aff'd, 101 F.3d 684 (2d Cir.), cert. denied, 519 U.S. 964, 117 S. Ct. 386 (1996).

of New Balance's, and would not even encounter Denimafia's products where New Balance's running shoes and athletic apparel are sold.[73]

Without more, the fact that both parties' products generally are goods that people wear, i.e., New Balance's footwear and Denimafia's denim apparel, is insufficient as a matter of law to establish competitive proximity that would support a likelihood of confusion. See, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d at 573-74 (that products "may both be generally defined as personal care products" was "of little help to [plaintiff's] argument that there is a likelihood of confusion"); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 582 (2d Cir. 1991) ("Although both [plaintiff's] publishing house and [defendant's] magazine are in the field of publishing, this does not render them proximate."); Guthrie Healthcare Sys. v. ContextMedia, Inc., 12 Civ. 7992, 2014 WL 185222 at *12 (S.D.N.Y. Jan. 16, 2014) ("While both businesses broadly relate to health, it is true that courts reject proximity analyses that are generalized at an overly high level." (emphasis added)); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *17 ("Although the products of the parties each relate to books, they are not proximate in the marketplace.  [Defendant] is a technology

---

[73]   Although New Balance produced non-technical t-shirts using the <=> design, they were promotional giveaways distributed to wholesale buyers and retailers in connection with the Minimus launch; the t-shirts were never for sale in the consumer marketplace.  (See page 12 above; see also Defs. Rule 56.1 Stmt. & Dkt. No. 108: Denimafia Counter-Stmt. ¶ 121.) See, e.g., Major League Baseball Props., Inc. v. Opening Day Prods., Inc., 385 F. Supp. 2d 256, 259, 262, 267 (S.D.N.Y. 2005) (Defendant "intended to sell its merchandise under the mark 'opening day' year round and not just in connection with opening days. . . . In connection with [plaintiff's] promotion [of the opening days of Major League Baseball seasons], baseball caps and baseballs were given away as souvenirs to fans attending the opening day games.  They bore a baseball diamond design containing the term 'opening day' to designate the opening day of the season . . . . No clothing items of any kind bearing the term 'opening day' were ever sold to the general public . . . . The third factor, competitive proximity, does not support defendant's claim.  Plaintiff's product was used on promotional giveaways and distributed at Major League Baseball stadiums in connection with the opening day of the season.  The fact that both parties use the term is insufficient to find competitive proximity." (emphasis added)).

company that offers a computer software called iBooks that enables users to download and read ebooks. The plaintiffs are publishing companies that use the ibooks imprint on their physical books and ebooks. These products do not directly compete. While the ebooks that can be read on [defendant's] iBooks software may compete directly with the plaintiffs' physical books and ebooks, a consumer could not purchase the defendant's product—software—in place of the plaintiffs'—books.").[74]

Accordingly, the competitive proximity factor weighs heavily in New Balance's favor.

### D.   Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 387 (2d Cir. 2005), cert. denied, 547 U.S. 1019, 126

---

[74]   See also, e.g., Vitarroz Corp. v. Borden, Inc., 644 F.2d at 967 ("[T]he products in this case differ in ways that may be deemed material to consumers. Although both are snack foods that can be eaten plain or used as a scoop for dips, only the crackers are ordinarily buttered or served with hors d'oeuvres. In addition, the ingredients of the products are markedly different. . . . More important, the record shows that [plaintiff] targets its product at a distinct group of consumers, who shop for the [plaintiff's] name in specialty stores, many of which do not carry [defendant's] chips. This factor is entitled to some weight, just like the analogous factor of the sophistication of the relevant purchasers."); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d at 491 (fact that "both of the parties' products exist within the same industry" does not establish competitive proximity likely to cause confusion where products "are sold through different channels of distribution"); Sunenblick v. Harrell, 895 F. Supp. at 629 ("[T]he trend toward fusion within the respective categories of music does not establish that consumers of one genre of music have become consumers of the other. Fusion notwithstanding, the products at issue here are marketed differently and are still sold in separate sections of record stores."); Restatement (Third) of Unfair Competition § 21 cmt. g (1995) ("Men's suits and [] men's ties bearing similar marks are more likely to be associated with a common source than are men's suits and women's shoes, in part because the latter kinds of goods are normally sold in different stores or departments and are purchased by different consumers.").

S. Ct. 1570 (2006).[75/]  "[T]he relevant inquiry is whether consumers are likely to associate the respective goods, services, or businesses of the parties by assuming that the prior user has expanded into the other market, not whether the prior user in fact intends to do so."  Restatement (Third) of Unfair Competition § 21 cmt. j (1995).[76/]  Thus, "unless the expansion is so imminent as to create a present likelihood of confusion, the intent of the prior user to expand or its activity in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion." Restatement (Third) of Unfair Competition § 21 Reporters' Note to cmt. j.[77/]

---

[75/]  See, e.g., Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615, 619 (2d Cir. 2008) ("This factor considers the likelihood that plaintiff will enter into the defendant's market—it protects the plaintiff's interest in being able to enter a related field at some future time."); Savin Corp. v. Savin Grp., 391 F.3d 439, 459-60 (2d Cir. 2004), cert. denied, 546 U.S. 822, 126 S. Ct. 116 (2005); YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x 392, 395 (2d Cir. 2003) ("This factor refers to the 'senior user's interest in preserving avenues of expansion and entering into related fields.'"); J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903883 at *18 (S.D.N.Y. May 8, 2013); O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 523 (S.D.N.Y. 2008).

[76/]  See also, e.g., Restatement (Third) of Unfair Competition § 21 cmt. j ("If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely.  On the other hand, the actual intentions of the prior user with respect to future expansion will not ordinarily affect the likelihood that prospective purchasers are confused.").

[77/]  See, e.g., YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x at 395 ("The expansion must occur or be likely to occur in the 'reasonably near future.'"); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 582 (2d Cir. 1991) ("'[T]he intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion.'"); Private Eyes Sunglass Corp. v. Private Eye Vision Ctr. of New Milford, P.C., No. CIV. B-89-45, 1992 WL 464228 at *9 (D. Conn. Aug. 13, 1992) ("The Court notes that even assuming that plaintiff intended to bridge this gap, the intent of the prior user to expand or its activities in preparation to do so, unless known by prospective purchasers, does not affect the likelihood of confusion.  Plaintiff has produced no evidence that prospective purchasers would assume that it was expanding into the eyecare field." (citation & quotations omitted)), aff'd, Nos. 92-9000, 92-9050, 992 F.2d 321 (table), 1993 WL 125974 (2d Cir. Mar. 18, 1993); see also, e.g., Lebewohl v. Heart Attack Grill LLC, 890 F. Supp. 2d 278, 295 (S.D.N.Y. 2012) ("A speculative intention is insufficient to
(continued...)

Denimafia argues that its "intent was always to expand the 5EP Logo beyond its initial offerings," stating: "Denimafia's business plans included areas of planned expansion from menswear to women's and children's.  The plan had always been for 5EP to become a lifestyle brand, where the five easy pieces would be five sets of garments, accessories, and shoes."  (Dkt. No. 103: Denimafia Opp. Br. at 11-12; see Dkt. No. 106: Rucci Aff. ¶ 69.)  Denimafia argues that expansion would occur "when resources allowed," and that its plans were unknown to its consumers because "[b]usiness expansion plans are generally considered confidential and are not disclosed to prospective customers until shortly before a new product launches."  (Denimafia Opp. Br. at 12; see Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶ 62; Rucci Aff. ¶¶ 70-71.)  Thus, Denimafia does not dispute that its alleged expansion plans were unknown to consumers, that its expansion was not imminent or definite, or that it planned to expand into athletic footwear.  (See Rucci Aff. ¶¶ 70-71; Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 59-62.)

Aside from Rucci's unsubstantiated assertions, there is nothing in the record that could plausibly support a claim that any kind of expansion by Denimafia is reasonably likely to occur in the reasonably near future, since Denimafia has been virtually defunct since approximately 2009.  (See Defs. Rule 56.1 Stmt. ¶¶ 71-77; see also pages 12-13 & n.27 above.)  Indeed, if Denimafia actually intended to expand into footwear, it would not have amended its trademark registration to remove shoes and footwear, among other products, from the listed classes of goods covered by trademark.  (See page 6 above.)  Denimafia fails to raise an issue of fact regarding the possibility that it would bridge the gap, and this conclusion is not altered by Denimafia's unspecific claims regarding the expansions of a "lifestyle brand" or of other "[f]ashion brands, including some

---

77/     (...continued)
         demonstrate that bridging the gap is likely; a litigant should provide evidence of a concrete
         expansion plan.").

of New Balance's competitors."  (Denimafia Opp. Br. at 12.)  See, e.g., Savin Corp. v. Savin Grp.,

391 F.3d at 460 ("Plaintiff claims that it intends to expand its involvement in the area of facilities

management, but the only evidence [P]laintiff presents to support this allegation is a statement [by

. . . Plaintiff's President and Chief Operating Officer,] that [P]laintiff intends to work[] in an office

environment and expand[] [into] whatever the customer needs.  This statement fails to support any

inference that [P]laintiff intends to enter [D]efendants' market.  We agree with the District Court's

conclusion that even drawing all inferences in Plaintiff's favor, this bare assertion fails to raise a

genuine issue of material fact that Plaintiff is likely to enter Defendants' corner of the marketplace."

(quotations & citation omitted)); YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x

at 395 ("Although [plaintiff], financially strapped and unable to maintain even a website, asserts that

it may consider franchising a restaurant chain under its name, this is not likely to occur in the

reasonably near future."); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *19 ("The

hypothetical possibility that the plaintiffs might have developed a more robust presence in the

'digital space' in the absence of [defendant's] use of the . . . mark hardly demonstrates that the

plaintiffs were likely to bridge the gap between the publishing and computer software fields.

Characterizing the defendant's field as the 'digital space' would render this factor meaningless.

Many companies operate in the 'digital space' without offering remotely similar products.").[78]

---

[78]    See also, e.g., Lang v. Ret. Living Publ'g Co., 949 F.2d at 582; Strange Music, Inc. v.
Strange Music, Inc., 326 F. Supp. 2d 481, 493 (S.D.N.Y. 2004) ("Plaintiffs contend that they
intend to bridge the gap by 'expand[ing] [their] compositions to include many of the sounds
of rap and hip hop.'  Such an intention does not equate to bridging the gap.  In order to bridge
the gap, plaintiffs must demonstrate that they intend to enter the market of defendants and
that prospective customers are aware of this intention.  Plaintiffs have failed to establish such
an ambition." (citations omitted)); Sunenblick v. Harrell, 895 F. Supp. 616, 630 (S.D.N.Y.
1995) ("While [plaintiff] suggested he might consider production of a jazz/hip-hop
combination such as one recent recording . . . , that is a far cry from joining the market for
hip-hop recordings as a competitor with [defendants].  It is evident that the motivating force
(continued...)

Accordingly, the bridging the gap factor weighs heavily in New Balance's favor.

## E.    Actual Consumer Confusion

"Under the Lanham Act, actual confusion refers to 'consumer confusion that enables a seller to pass his goods off as the goods of another.'" First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *10 (S.D.N.Y. July 15, 2004). "Although evidence of actual confusion is especially probative of a likelihood of confusion, a plaintiff does not need to show the existence of actual confusion in order to prevail under the Lanham Act." J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903883 at *19 (S.D.N.Y. May 8, 2013).[79/]   Actual confusion may be demonstrated by consumer surveys and anecdotal evidence of consumer confusion. See, e.g., Paco Sport, Ltd. v. Paco Rabanne Perfumes, No. 00-

---

[78/]    (...continued)
behind [plaintiff's] company was his dream to produce one particular variety of jazz music, and to record artists who otherwise might never have been heard.  Consequently, the court finds that [plaintiff] has no present plans to enter the hip-hop market, and is unlikely to do so in the future.  This factor, then, weighs strongly against a finding of confusion, and favors defendants."), aff'd, 101 F.3d 684 (2d Cir.), cert. denied, 519 U.S. 964, 117 S. Ct. 386 (1996); Horn's, Inc. v. Sanofi Beaute, Inc., 963 F. Supp. 318, 325 (S.D.N.Y. 1997) ("Plaintiff contends that it has long intended to market clothing, fashion accessories and perfume under its . . . mark.  In support of this assertion, plaintiff offers [a] declaration[] . . . establish[ing] that companies having an expertise in fashion often market perfumes. . . . That a provider of fashion-related consulting services and trade publications would enter the fragrance market, however, is hardly a foregone conclusion.  Indeed, plaintiff has failed to show that it had any concrete plans to market a perfume. . . . Although plaintiff alleges that it 'has been approached . . . to develop a perfume product under the . . . mark,' there is no evidence of such discussions in the record. . . . [N]one of [plaintiff's] plans to develop and market a fragrance is concrete, nor has any materialized.  Since plaintiff has not shown that its plans to enter the fragrance market are more than 'wholly speculative,' this factor militates against finding a likelihood of confusion." (citation omitted)).

[79/]    See, e.g., Savin Corp. v. Savin Grp., 391 F.3d 439, 459 (2d Cir. 2004) ("'[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act . . . .' Nonetheless, it has been noted that: 'There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.'"), cert. denied, 546 U.S. 822, 126 S. Ct. 116 (2005); Real News Project, Inc. v. Indep. World Television, Inc., 06 Civ. 4322, 2008 WL 2229830 at *17 (S.D.N.Y. May 27, 2008) (Lynch, D.J.).

7344, 234 F.3d 1262 (table), 2000 WL 1721126 at *5 (2d Cir. Nov. 16, 2000); <u>J.T. Colby & Co.</u> v.

<u>Apple Inc.</u>, 2013 WL 1903883 at *17 ("When parties do offer evidence of actual confusion, or lack

thereof, the evidence commonly includes anecdotal evidence of consumer confusion and consumer

confusion surveys."); <u>Real News Project, Inc.</u> v. <u>Indep. World Television, Inc.</u>, 2008 WL 2229830

at *17.  Where a defendant submits survey evidence "tending to rebut charges of actual consumer

confusion" and plaintiff offers only <u>de minimis</u> anecdotal evidence, plaintiff's "failure to present its

own consumer survey weighs against a finding of consumer confusion."  <u>Star Indus., Inc.</u> v. <u>Bacardi</u>

<u>& Co.</u>, 412 F.3d 373, 388 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1019, 126 S. Ct. 1570 (2006).[80/]

   Denimafia did not submit survey evidence of actual confusion in the marketplace,

choosing instead to rely on five anecdotal instances of alleged consumer confusion, documented by

five emails and text messages sent to Rucci from her friends and colleagues.  (<u>See</u> page 15 above.)

New Balance, on the other hand, submitted a consumer survey conducted by its expert Dr. Steckel,

which showed a zero percent rate of reverse confusion with respect to the source of jeans bearing

the <=> mark.  (<u>See</u> pages 18-19 above.)  The Court finds that no reasonable juror could find that

Denimafia's evidence demonstrates any actual confusion and, thus, no reasonable juror could find

that Denimafia's evidence outweighs New Balance's expert survey results.

---

[80/] <u>See</u>, <u>e.g.</u>, <u>Natural Organics, Inc.</u> v. <u>Nutraceutical Corp.</u>, 271 F. App'x 89, 90 (2d Cir. 2008);
<u>Savin Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d at 459 ("A single 'anecdote[] of confusion over the
entire course of competition,' however, 'constitute[s] <u>de minimis</u> evidence insufficient to
raise triable issues.'"); <u>Nora Beverages, Inc.</u> v. <u>Perrier Grp. of Am., Inc.</u>, 269 F.3d 114, 123-
24 (2d Cir. 2001); <u>Paco Sport, Ltd.</u> v. <u>Paco Rabanne Perfumes</u>, 2000 WL 1721126 at *5
("The district court discounted the testimony of Paco Rabanne's employees and associates
as unreliable and relied on Paco Sport's survey. . . . The district court did not err in holding
this factor to favor Paco Sport."); <u>Guthrie Healthcare Sys.</u> v. <u>ContextMedia, Inc.</u>, 12 Civ.
7992, 2014 WL 185222 at *7 (S.D.N.Y. Jan. 16, 2014); <u>Real News Project, Inc.</u> v. <u>Indep.</u>
<u>World Television, Inc.</u>, 2008 WL 2229830 at *17 ("A plaintiff's failure to submit a consumer
survey weighs against a finding of consumer confusion, because the 'absence of surveys is
evidence that actual confusion cannot be shown.'" (citation omitted)); <u>Strange Music, Inc.</u>
v. <u>Strange Music, Inc.</u>, 326 F. Supp. 2d 481, 493-94 (S.D.N.Y. 2004).

As an initial matter, none of Denimafia's five alleged instances demonstrates actual confusion. In each instance, the individuals reportedly saw the <=> mark on a New Balance advertisement and contacted Rucci to report what they had seen and, as her friends and colleagues, to inquire whether Denimafia and New Balance were working on a collaboration; none of them testified that New Balance's use of the <=> mark affected a purchasing decision of any kind or confused them as to the source of the products. (See pages 15-18 above.) See, e.g., O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 524 (S.D.N.Y. 2008) ("[B]ecause 'the relevant confusion is that which affects the purchasing and selling of the goods or services in question,' to be evidence of actual confusion in the marketplace, the testimony must indicate that the 'confusion affected [the potential customer's] determination to purchase [plaintiff's] product.'").[81/] Even assuming arguendo that Denimafia's alleged incidents showed confusion, five anecdotes from Rucci's friends and colleagues since New Balance began using the <=> mark constitutes de minimis evidence, insufficient to raise a triable issue. See, e.g., Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d at 123-24 (Plaintiff "argues that the district court erred by not considering the testimony of [plaintiff's] employees regarding two anonymous consumers who had allegedly inadvertently grabbed [defendant's] bottles when they had intended to select [plaintiff's] bottles. . . .

---

[81/]    See also, e.g., Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d at 124 ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself."); Guthrie Healthcare Sys. v. ContextMedia, Inc., 2014 WL 185222 at *7 ("[A]ccording to plaintiff, . . . a design firm[] advised [defendant] of the similarity of the [plaintiff's] Trademark and the [defendant's] . . . . [T]hose statements cannot raise a triable issue as to actual consumer confusion. At best, such statements—if admissible—might support possible consumer confusion." (quotations omitted)); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 320 (S.D.N.Y.) ("[G]iven their professional association with the plaintiff, Paco Rabanne's witnesses' testimony regarding their purported confusion does not demonstrate actual consumer confusion in the marketplace."), aff'd, No. 00-7344, 234 F.3d 1262 (table), 2000 WL 1721126 (2d Cir. Nov. 16, 2000).

[W]e do not believe that the district court erred in finding that two anecdotes of confusion over the entire course of competition constituted <u>de minimis</u> evidence insufficient to raise triable issues.").[82/]

Denimafia does not offer a rebuttal survey and does not seek to exclude New Balance's survey, but argues that the Court should "not find Dr. Steckel's survey results persuasive." (Dkt. No. 103: Denimafia Opp. Br. at 13 n.6, 16; <u>see</u> pages 15, 19 n.40 above.)  Denimafia asserts three primary objections to Dr. Steckel's survey: (1) an Eveready survey format was not appropriate in this reverse confusion context; (2) the surveyed universe was overly broad and should have been limited to males between the ages of eighteen and forty-five;[83/] and (3) the test cell stimuli was incorrect because it used "the only instance in which the 5EP LOGO is rotated 90 degrees clockwise and appears vertically." (Denimafia Opp. Br. at 13-15; Denimafia Rule 56.1 Counter-Stmt. ¶¶ 127-33.)  The Court considers each objection in turn.

First, Denimafia argues that the Eveready survey format only is appropriate in cases of forward confusion involving a senior user with a strong mark. (Denimafia Opp. Br. at 14.)[84/]  Dr.

---

[82/]    See also, e.g., Natural Organics, Inc. v. Nutraceutical Corp., 271 F. App'x at 90 ("Anecdotal evidence of consumer confusion offered by [plaintiff] does not compel a finding of actual customer confusion in the absence of direct consumer testimonials or surveys."); Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 387-88 ("The district court found that the 'actual consumer confusion' factor militated against finding a likelihood of confusion.  In light of the record, this holding was not clearly erroneous.  The court explained that [plaintiff's] evidence of actual confusion was extremely weak . . . . [Plaintiff's] evidence of actual confusion consisted entirely of testimony by several interested witnesses recounting a handful of anecdotes . . . ."); see also cases cited at page 48 n.80 above.

[83/]    Denimafia defines its likely consumer demographic as between the ages of 18 and 25 in some instances, and between the ages of 18 and 45 in others.  (Compare, e.g., Denimafia Opp. Br. at 14, with Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt. ¶ 127, and Dkt. No. 106: Rucci Aff. ¶ 72.)

[84/]    The Court notes that Denimafia contradicts itself by arguing in favor of the strength of its mark in the context of the first Polaroid factor, and then arguing that the Eveready survey was improper due to the weakness of Denimafia's mark.  (Denimafia Opp. Br. at 5-7; see (continued...)

Steckel testified that he chose an Eveready survey specifically because the format "is often useful when a potential respondent can identify that the product . . . in question comes from a specific source, but cannot name that source."  (Dkt. No. 109: Benjamin Aff. Ex. 7: Steckel Dep. at 16, 55.) Further, Dr. Steckel testified that because an Eveready survey displays only one product, as compared to other formats which ask respondents to compare multiple products displayed simultaneously or sequentially, it was best suited to replicate the relevant market conditions in this case, since "the distribution methods" of Denimafia's and New Balance's products are insulated from each other, such that consumers would not see both Denimafia's products and New Balance's products at the same time.  (Steckel Dep. at 54-56.)  The Court is satisfied that Dr. Steckel had good reason for employing the Eveready format for reverse confusion analysis.  See, e.g., Kargo Global, Inc. v. Advance Magazine Publishers, Inc., 06 Civ. 550, 2007 WL 2258688 at *8 (S.D.N.Y. Aug. 6, 2007) ("Here, where [plaintiff] has alleged that reverse confusion has occurred . . . , it would have been far more replicative of actual marketplace conditions to have [used] . . . the Eveready format. A survey that utilizes the Eveready format, by displaying only a single party's mark and attempting to discern whether respondents are confused as to the source of the mark, is much more reliable because it more accurately approximates actual market conditions by ensuring that respondents are not made artificially aware of the other party's trademark." (citations & quotations omitted)); cf., e.g., THOIP v. Walt Disney Co., 788 F. Supp. 2d 168, 178-81 (S.D.N.Y. 2011) ("in testing for reverse confusion," plaintiff's expert "failed to replicate actual marketplace conditions" by designing a "sequential array survey" in which respondents were exposed to both parties' products, "despite

---

(...continued)
        pages 28-30 above.)

the absence of evidence that such products would be encountered in close proximity in the actual marketplace").[85]

        Second, Denimafia argues that the surveyed universe was overly broad and should have been limited to males between the ages of eighteen and either twenty-five or forty-five, which it purports to be the likely buyers of Denimafia's jeans.  (See page 50 above.)[86]  It is true that Denimafia's consumers are the appropriate survey universe.  See, e.g., J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *19 ("In the context of a case where reverse confusion is alleged, the senior user's consumers are the appropriate class of consumers to survey.").[87]  Dr. Steckel defined

---

[85]    Moreover, any diminution in the value attributed to the survey as a result of the format would, at most, reduce the evidentiary weight of Dr. Steckel's survey, but it would not tip the scale in Denimafia's favor.  See, e.g., Akiro LLC v. House of Cheatham, Inc., 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) (A "reasonable juror could discount [defendant's] survey evidence to some degree and find that this Polaroid factor favors [defendant] only weakly. . . . [B]y design [the Eveready format] will underestimate confusion for marks that are not highly accessible in a consumer's memory. . . . [A] reasonable juror could conclude that [plaintiff's] mark is weak enough to diminish somewhat the evidentiary weight of the [defendant's] survey.").

[86]    Denimafia's demographics representation is entirely unsubstantiated.  (See Dkt. No. 115: Defs. Reply Br. at 7 ("This claim, however, is unsupported and contradicted by the evidence in this case.  Ms. Rucci supplies no gender based sales data, customer surveys, or other data to support her claim.  There is no evidence to suggest that Denimafia limited its minimal marketing efforts to men."); Benjamin Aff. Ex. 7: Steckel Dep. at 110-11 (Dr. Steckel would not think it appropriate to "limit the universe to . . . 95 percent male and 5 percent female respondents" solely "[b]ased on [Denimafia's] word of the people who have bought" its jeans).)

[87]    See, e.g., Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991) ("Evidence of actual reverse confusion that might support [plaintiff's] claim would involve purchasers or prospective purchasers of [plaintiff's] products who believed that they were produced by or affiliated with [defendant's] magazine."); Vista Food Exch., Inc. v. Vistar Corp., No. 03-CV-5203, 2005 WL 2371958 at *6 (E.D.N.Y. Sept. 27, 2005) ("[W]hen the issue is whether consumers mistakenly believe that the senior user's products actually originate from the junior user ('reverse' confusion), the appropriate universe consists of the senior user's customers."); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10 (4th ed. 2013).

the relevant population as Internet shoppers age eighteen or above who purchased jeans in the $100 to $1,000 price range within the past twelve months.  (See page 19 above.)  In describing why age and gender demographics were not factors in defining the universe of qualified survey respondents, Dr. Steckel testified: "It's not relevant just because a market is distributed that way. . . . The most relevant thing was whether they would potentially buy the product, and I -- I screened for that by asking whether they bought designer jeans in the past year, and how much they paid for them." (Benjamin Aff. Ex. 7: Steckel Dep. at 50-51, 110-11.)

Denimafia offers no expert rebuttal evidence that Dr. Steckel's methodology was improper.  (See page 19 n.40 above.)[88]  Moreover, any argument that a narrower subset of the surveyed universe would have returned a markedly different result is weakened significantly by the fact that Dr. Steckel's survey returned zero incidents of confusion.  (See page 19 above.)

Third, Denimafia argues that Dr. Steckel used an improper test image because the hangtag displayed the <=> mark vertically instead of horizontally.  (See page 50 above.)  This argument ignores the fact that "the image in the survey was taken from the only photograph of the actual product with a hangtag bearing the mark shown on Denimafia's website."  (Defs. Reply Br. at 7 n.9.)  The Court also notes that, of the product images Denimafia has submitted to this Court, the hanging tag which displays the mark vertically is the only one that shows the <=> mark without the 5EP and/or Denimafia brand names in a larger font.[89]  The lack of alternative images "actually

---

[88]   See, e.g., 6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:159 ("The universe may be narrowed from the population at large in various ways: geographically (people living in California); commercially (retail dealers or consumers); according to buying habits (prospective purchasers of pleasure boats); or by any other meaningful criteria which the law sets down as limiting or defining the class of persons whose state of mind is at issue.").

[89]   The hanging tag does have the words "5EP Project" in very small font on the top of the tag,
(continued...)

underscore[s] the fact that plaintiffs' mark is always surrounded by contextual information linking the mark to" its source.  J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *21 n.31.  Finally, Denimafia's third argument is meritless for the more important reason that the evidence in the record supports that the image Dr. Steckel used most replicates the way the tag would hang in the marketplace.  Cf., e.g., THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 238-39 & n.153 (S.D.N.Y. 2010) ("The shirts used in the survey did not bear the neck labels and hang tags that would have been attached to the shirts in the marketplace. . . . [Plaintiff's survey expert's] failure to use hang tags and neck labels clearly is a deviation from actual marketplace conditions." (collecting cases)).

Accordingly, the actual confusion factor weighs heavily in New Balance's favor.

## F.  **Intent**

"As indirect evidence of likelihood of confusion, courts consider whether the defendant adopted the similar mark with the intent to capitalize on the plaintiff's reputation and goodwill or to foment confusion between the two marks."  J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903883 at *23 (S.D.N.Y. May 8, 2013).[90/]  In reverse confusion cases, however, "'it is unlikely that a larger and better known junior user intends to trade on the reputation of the lesser-known plaintiff,'" and "'[t]his factor is therefore less relevant in a reverse confusion inquiry, although any finding that the defendant adopted its mark with an intent to cause any form of confusion should weigh in favor of the plaintiff.'"  THOIP v. Walt Disney Co., 788 F. Supp. 2d 168,

---

[89/]   (...continued)
but that branding is not readable in the image used for the survey.  (See pages 8-9, 19 above.)

[90/]   See, e.g., U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 511 F. App'x 81, 84 (2d Cir. 2013); Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 388 (2d Cir. 2005), cert. denied, 547 U.S. 1019, 126 S. Ct. 1570 (2006); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 124 (2d Cir. 2001).

184 n.95 (S.D.N.Y. 2011) (quoting First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *12 (S.D.N.Y. July 15, 2004)).[91/]

"The burden of proving bad faith rests with the party claiming infringement." J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *23 (citing Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 388). "The failure of a defendant to conduct a trademark search, however, is not sufficient to demonstrate bad faith." J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *23.[92/] "Indeed, even 'actual knowledge of another's prior registration of a very similar mark may be consistent with good faith.'" J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *23.[93/] "A defendant may also choose to offer evidence of its good faith, such as the fact that the defendant selected a mark which reflected the product's characteristics, requested a trademark search prior to the mark's selection, or relied on the advice of counsel in adopting the mark." J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *23; see, e.g., Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 388.

Denimafia argues that questions of fact exist as to New Balance's intent in adopting the mark because New Balance knew of Denimafia's mark and chose to use it despite options of "variations more different from the 5EP LOGO." (Dkt. No. 103: Denimafia Opp. Br. at 16.) New

---

[91/]   See, e.g., Birmingham v. Mizuno USA, Inc., No. 09-CV-0566, 2011 WL 1299356 at *17 n.20 (N.D.N.Y. Mar. 31, 2011); 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10 (4th ed. 2013) (in reverse confusion cases, the inquiry should be "whether, despite acting innocently, the junior user 'was careless in not conducting proper research to avoid infringement prior to development of its trademark'").

[92/]   See, e.g., Savin Corp. v. Savin Grp., 391 F.3d 439, 460 (2d Cir. 2004), cert. denied, 546 U.S. 822, 126 S. Ct. 116 (2005); Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 388; Guthrie Healthcare Sys. v. ContextMedia, Inc., 12 Civ. 7992, 2014 WL 185222 at *8 (S.D.N.Y. Jan. 16, 2014).

[93/]   See, e.g., Savin Corp. v. Savin Grp., 391 F.3d at 460; Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 388; First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 2004 WL 1575396 at *10.

Balance does not dispute its knowledge of Denimafia's mark, but argues that the evidence nevertheless establishes that it acted in good faith because it shows that New Balance used an advertising agency to develop ideas that "directly reflect the product's characteristics of minimal design," and that it took affirmative steps "to further distinguish the appearance of the symbols from Denimafia by using a typeface and overall design that was distinct from Denimafia." (Dkt. No. 88: Defs. Br. at 22.)  New Balance further argues that "the evidence demonstrates that at the time New Balance began using the symbols, Denimafia was a defunct denim company that did not sell footwear or athletic apparel, and there was no possibility that the use of the symbols could impact Denimafia or cause confusion."  (Dkt. No. 115: Defs. Reply Br. at 8.)

Denimafia, which has the burden of proof, has not identified any evidence raising an issue of fact as to whether New Balance used the mark with the intent to cause confusion.  See, e.g., YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x 392, 395 (2d Cir. 2003) (Defendant "exhibited good faith in this matter.  It enlisted an outside attorney to conduct a trademark search . . . . Only . . . upon independently determining that its use did not infringe on [plaintiff's] rights, did [defendant] begin using the Slogan.  Such measures indicate [defendant's] good faith."); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d at 125 ("To prove [defendant's] bad faith, [plaintiff] points to the fact that [defendant] ultimately selected a ribbed cylindrical PET bottle from the 'limitless array' of available design options.  [Plaintiff] contends that insofar as the good faith factor involves a question of [defendant's] state of mind, it is an issue of fact that should not be resolved on summary judgment. . . . We believe that the district court was correct to find in this case that copying alone was insufficient to establish bad faith.  The only evidence of bad faith that [plaintiff] proffered was [defendant's] bottle.  At the same time, [defendant] offered evidence that its bottle choice was based upon a desire to compete with [another company], not [plaintiff].  Also,

by placing its labels prominently upon its bottles, [defendant] negated an inference of intent to deceive consumers as to the source of its product.").[94/]

       Accordingly, the intent factor is neutral.

### G.    Quality

       "'Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product.'"  Sly Magazine, LLC v. Weider Publ'ns L.L.C., 346 F. App'x 721, 723 (2d Cir. 2009).  Where, as here, there are no allegations or evidentiary showings pertaining to the products' quality (see Dkt. No. 88: Defs. Br. at 17 n.17), this factor is not weighed in either party's favor.  See, e.g., Sly Magazine, LLC v. Weider Publ'ns L.L.C., 346 F. App'x at 723 ("The court properly found

---

[94/] See also, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993) (Defendant "selected a name which matched the image it was trying to project . . . . [Defendant's] knowledge of [plaintiff's] trademark does not necessarily give rise to an inference of bad faith, 'because adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith.' [Plaintiff] has not put forth any evidence that [defendant] intended to promote confusion between the products or appropriate [plaintiff's] good will and therefore has not shown any bad faith on [defendant's] part." (citations omitted)); Guthrie Healthcare Sys. v. ContextMedia, Inc., 2014 WL 185222 at *7-9 (defendant used "a third-party graphic artist" and instructed him "to create a logo that fit their characteristics and desired brand"); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *23 ("The plaintiffs have offered no evidence indicating that [defendant] adopted the . . . mark in bad faith.  This absence of evidence is not surprising given the plaintiffs' small footprint in the marketplace.  The defendant, on the other hand, has offered substantial evidence of its good faith.  First, the defendant selected a mark that describes characteristics of its product. . . . The mark is also related to marks [defendant] has adopted for other products and services it offers.  The defendant also employed counsel to conduct a trademark search . . . ." (fn. omitted)); Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) ("[G]iven [plaintiff's] low sales volume and the lack of evidence of secondary meaning, it is patently unreasonable to conclude that defendants sought to usurp that reputation or to otherwise capitalize on it.  Moreover, even if defendant . . . did know of plaintiff's registration, '[p]rior knowledge of a senior user's mark does not, without more, create an inference of bad faith.'"); O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 494 (S.D.N.Y. 2004).

that there was no allegation or evidence that the Defendants' magazine is of inferior quality. Because there was no difference in quality of product, it was improper to weigh this factor in favor of the Defendants; this factor should be considered neutral." (citation omitted)); Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 389 (2d Cir. 2005) ("The quality factor does not support either party. . . . [A]bsent factual findings or evidence one way or the other, this factor is at most evenly balanced."), cert. denied, 547 U.S. 1019, 126 S. Ct. 1570 (2006); W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993) (plaintiff "did not allege that [defendant's] products are of inferior quality and therefore the absence of this factor also supports the district court's determination" of no reverse confusion); J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903883 at *25 (S.D.N.Y. May 8, 2013); Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) ("[N]othing in the record suggests that defendants' products are of inferior quality. Accordingly, this factor is entitled to no weight.").[95]

Accordingly, the quality factor is neutral.

**H.    Consumer Sophistication**

---

[95]    In some cases, similarity in the quality of the products can indicate a greater likelihood of confusion. See, e.g., Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 389; Savin Corp. v. Savin Grp., 391 F.3d 439, 461 (2d Cir. 2004), cert. denied, 546 U.S. 822, 126 S. Ct. 116 (2005); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *25. Assuming, arguendo, that the evidence established that the products were of comparable quality, this would not affect the neutrality of this factor here, since the parties' products are dissimilar and lack competitive proximity. See, e.g., Savin Corp. v. Savin Grp., 391 F.3d at 461 ("[A]s Defendants' services were 'not closely similar to those provided by [P]laintiff,' any equivalence in 'quality between their products [was] unlikely to cause confusion.'"); O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) ("[T]here is no competitive proximity between [plaintiff's] advertising and design services on the one hand and [defendant's] credit card and related services on the other. Therefore, regardless of whether [plaintiff's] products are of equal quality to [defendant's], this factor favors neither party.").

"Our analysis of consumer sophistication 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 390 (2d Cir. 2005), cert. denied, 547 U.S. 1019, 126 S. Ct. 1570 (2006).[96/] "A sophisticated consumer is less likely to be confused by similar marks than is a casual shopper." J.T. Colby & Co. v. Apple Inc., 11 Civ. 4060, 2013 WL 1903883 at *25 (S.D.N.Y. May 8, 2013).[97/] "Consumer sophistication may be proved by direct evidence such as expert opinions or surveys.  In addition, in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 390; see, e.g., Savin Corp. v. Savin Grp., 391 F.3d at 461-62 (no error in district court's findings that were "somewhat in the nature of 'common sense' assumptions").  The relevant consumers for this analysis are those who purchase Denimafia's products.  See, e.g., Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 742 (2d Cir. 1994) ("This case primarily involves reverse confusion, where consumers mistake [plaintiff's] products as originating with [defendant].  In such a case, the consumers relevant to the purchaser sophistication inquiry are those who purchase [plaintiff's] products.").

---

[96/]    See, e.g., Savin Corp. v. Savin Grp., 391 F.3d 439, 461 (2d Cir. 2004) ("[T]he pertinent question is whether 'numerous ordinary prudent purchasers' would likely 'be misled or confused as to the source of the product in question because of the entrance in the marketplace of [Defendants'] mark.'"), cert. denied, 546 U.S. 822, 126 S. Ct. 116 (2005); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc., 02 Civ. 3691, 03 Civ. 707, 2004 WL 1575396 at *11 (S.D.N.Y. July 15, 2004).

[97/]    See, e.g., Sly Magazine, LLC v. Weider Publ'ns L.L.C., 346 F. App'x 721, 723 (2d Cir. 2009) ("As for the sophistication of customers, 'the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace.'"); Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615, 620 (2d Cir. 2008); Savin Corp. v. Savin Grp., 391 F.3d at 461; Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 314 (S.D.N.Y. 2010); Restatement (Third) of Unfair Competition § 21 cmt. h (1995).

New Balance asserts "that the relevant consumers in this case are unusually highly sophisticated," relying on Professor Handley's expert report as well as Denimafia's witnesses' statements attesting to the sophistication of its consumers.[98]

In view of the uncontroverted evidence establishing Denimafia's consumers' sophistication, no reasonable juror could conclude that such purchasers are likely to be confused. See, e.g., Star Indus., Inc. v. Bacardi & Co., 412 F.3d at 390; J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *25; Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d at 314; Sunenblick v. Harrell, 895 F. Supp. 616, 634 (S.D.N.Y. 1995), aff'd, 101 F.3d 684 (2d Cir.), cert. denied, 519 U.S. 964, 117 S. Ct. 386 (1996).[99]

This is particularly true where, as here, there is minimal similarity between the parties' products, and the only way consumers can purchase Denimafia's products is by navigating to its website and making a personal inquiry about placing a prospective order. See, e.g., O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) ("Although it is

---

[98]     Dkt. No. 88: Defs. Br. at 18-19; Dkt. No. 89: Defs. Rule 56.1 Stmt. ¶¶ 63-66; Dkt. No. 90: Edelman Aff. Ex. 1: Rucci Dep. at 251 (Denimafia's customers "tend to be very well educated about jeans products"); Edelman Aff. Ex. 29: Blundell Dep. at 53, 56-57 (Denimafia's customers are "specialist[s]," not "the average person"); Edelman Aff. Ex. 30: Blomquist Dep. at 67 ("Q.  Would you characterize them as sophisticated customers?  A.  Yes, at -- at that time, yes."); Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶¶ 43-46, 50; see also Dkt. No. 106: Rucci Aff. ¶ 72.  Denimafia does not dispute that its consumers are highly sophisticated.  See Dkt. No. 115: Defs. Reply Br. at 8; see generally Dkt. No. 103: Denimafia Opp. Br.; Dkt. No. 108: Denimafia Rule 56.1 Counter-Stmt.

[99]     The result would not change if the retailers were considered as the relevant consumers. (Defs. Br. at 19 n.18; Edelman Aff. Ex. 31: Handley Aff. Ex. 1: Handley Report ¶ 49.)  See, e.g., W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 576 (2d Cir. 1993) ("Retailers are assumed to be more sophisticated buyers and thus less prone to confusion."); J.T. Colby & Co. v. Apple Inc., 2013 WL 1903883 at *25; Restatement (Third) of Unfair Competition § 21 cmt. h ("It is generally thought that professional purchasers are more discerning and less easily confused than casual purchasers, and that most purchasers exercise greater care when buying expensive items . . . .").

true that 'when . . . there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion,' there is no similarity between the parties services or marks in this case.  This factor weighs in [defendant's] favor." (citation omitted)); Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 495-96 (S.D.N.Y. 2004) ("[S]hoppers on the Internet, who seek to purchase either party's products, are relatively sophisticated and will not suffer confusion when they search for these products on the web.  The consumer is not shopping for a fungible good—6–inch round, laser discs.  Typically, he or she is searching for an artist's composition or performance. . . . 'Internet shoppers have a specific product in mind when they go online and have the ability to navigate the Internet to get what they want.'").[100]

Accordingly, the consumer sophistication factor weighs in New Balance's favor.

## I.     **Balancing the Polaroid Factors**

The Court concludes that Denimafia has failed to raise an issue of fact as to the likelihood of confusion.  Even if the weakness of the mark (first factor) was held to weigh against New Balance because this is a reverse confusion case (see page 33 n.58 above), and even if New Balance's survey evidence of lack of confusion (fifth factor) was discounted and found to weigh only slightly in New Balance's favor (see page 52 n.85 above), four of the remaining six factors—similarity of the marks (second factor), competitive proximity (third factor), bridging the gap (fourth factor), and consumer sophistication (eighth factor)—all weigh in New Balance's favor, and the intent (sixth factor) and quality of the products (seventh factor) are neutral.  Accordingly,

---

[100]     See also, e.g., YouGottaEat, Inc. v. Checkers Drive-In Rests., Inc., 81 F. App'x 392, 395 (2d Cir. 2003) ("parties do not share the same customer base" where defendant's consumers seek products for immediate purchase and plaintiff's consumers "are people who go online, research restaurants and print discount coupons to be used at a later time"); Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d at 314 ("[I]nternet shoppers are even less likely to suffer confusion over similar label marks because they are typically 'searching for an artist's composition or performance.'").

the Court finds that no reasonable juror could conclude that the overall balancing of the <u>Polaroid</u>

factors weighs in Denimafia's favor.  <u>See</u>, <u>e.g.</u>, <u>Sly Magazine, LLC</u> v. <u>Weider Publ'ns L.L.C.</u>, 346

F. App'x 721, 723 (2d Cir. 2009) ("Notwithstanding that we find that two <u>Polaroid</u> factors—'quality

of product' and 'sophistication of customers'—should be considered as neutral in the <u>Polaroid</u>

analysis, that fact does not affect our analysis of the six remaining factors, all of which weigh in the

Defendants' favor.  We agree with the district court, therefore, that the overall balancing of the

Polaroid factors does weigh in favor of the Defendants.  For that reason, we affirm the grant of

summary judgment in favor of the Defendants with respect to the Lanham Act claims."); <u>Savin</u>

<u>Corp.</u> v. <u>Savin Grp.</u>, 391 F.3d 439, 462 (2d Cir. 2004) ("[O]ne of the <u>Polaroid</u> factors—similarity

of marks—weighs in Plaintiff's favor, while the other factors weigh in favor of Defendants. . . . [W]e

find nothing to quarrel with in the District Court's . . . ultimate conclusion that that [Lanham Act

infringement] claim cannot survive summary judgment.  In sum, Plaintiff 'has not at this point

demonstrated a likelihood of confusion.'"), <u>cert. denied</u>, 546 U.S. 822, 126 S. Ct. 116 (2005);

<u>Gameologist Grp., LLC</u> v. <u>Scientific Games Int'l, Inc.</u>, 838 F. Supp. 2d 141, 164 (S.D.N.Y. 2011)

("[T]he strength of the mark and the good faith of the defendants are at best neutral for the plaintiff.

The quality of the defendants' mark is also neutral.  However, the rest of the factors weigh heavily

against the plaintiff. . . . Consequently, the plaintiff has failed to raise a genuine issue of material

fact as to likelihood of confusion and the defendants' motion for summary judgment dismissing the

plaintiff's Lanham Act trademark infringement claim and false designation of origin and unfair

competition claim is granted."), <u>aff'd</u>, 508 F. App'x 31 (2d Cir. 2013); <u>THOIP</u> v. <u>Walt Disney Co.</u>,

788 F. Supp. 2d 168, 191 (S.D.N.Y. 2011) ("The (1) competitive proximity and (2) similar quality

of the shirts at issue in this case and the (3) strength of [defendant's] mark weigh slightly in

[plaintiff's] favor on the issue of reverse confusion.  Had [plaintiff] submitted strong (probative and

reliable) survey evidence of reverse confusion, I would conclude that a reasonable juror <u>could</u> find reverse confusion.  However, in light of (4) the lack of (probative and reliable) survey evidence suggestive of actual reverse confusion, (5) [defendant's] lack of bad faith, and (6) the lack of (non-hypothetical) evidence that the [defendant's products] are likely to overwhelm [plaintiff's] mark, I conclude that no reasonable juror could find reverse confusion."); <u>O'Keefe</u> v. <u>Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d 500, 526 (S.D.N.Y. 2008); <u>see also</u> page 25 n.47 above.

New Balance is granted summary judgment on all claims.[101]

---

[101]     All of Denimafia's claims are defeated by the Court's determinations in the trademark infringement analysis. (<u>See</u> Dkt. No. 88: Defs. Br. at 10 n.8.) <u>See</u>, <u>e.g.</u>, <u>Sly Magazine, LLC</u> v. <u>Weider Publ'ns L.L.C.</u>, 346 F. App'x at 723 ("To prevail on a New York unfair competition claim, a plaintiff must show either actual confusion or a likelihood of confusion, and there must be 'some showing of bad faith' on the part of the defendants.  Because the Plaintiff failed to raise a genuine issue of material fact concerning bad faith, the district court's dismissal of the Plaintiff's state law unfair competition claim is affirmed." (citation omitted)); <u>J.T. Colby & Co.</u> v. <u>Apple Inc.</u>, 11 Civ. 4060, 2013 WL 1903883 at *26 (S.D.N.Y. May 8, 2013); <u>Kate Spade LLC</u> v. <u>Saturdays Surf LLC</u>, 950 F. Supp. 2d 639, 648 (S.D.N.Y. 2013) ("The elements of the New York State infringement claim are essentially the same as those under the Lanham Act.  Similarly, the New York State claims of unfair competition and misappropriation require a showing of actual confusion or likelihood of confusion, and the additional element of bad faith.  Because the elements of the state law claims mirror the elements of the federal claims, I find in favor of [counterclaim-defendant] on those claims as well." (citations omitted)).

**CONCLUSION**

For the reasons set forth above, New Balance's motion for summary judgment (Dkt.

No. 87) is <u>GRANTED</u>.   New Balance is to advise the Court by March 10, 2014 whether it

voluntarily withdraws its counterclaims, which would moot Denimafia's cross-motion (Dkt. No. 91).

(<u>See</u> page 2 n.2 above.)

SO ORDERED.

Dated:          New York, New York
               March 3, 2014

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:  All Counsel